# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BOBBY G. SLATE, et al.,      )
                                 )
             Plaintiffs,     )
                                 )
    v.                   )       1:09CV852
                                 )
RHONDA L. BYRD, et al.,    )
                                 )
             Defendants.    )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge on Plaintiffs' Motion to Strike and for Sanctions (Docket Entry 94), as well as: (1) Defendant John Washington's Motion for Summary Judgment (Docket Entry 70); (2) Southern Community Bank and Trust's Motion for Summary Judgment (Docket Entry 72); (3) Defendant Quincy Washington's Motion for Summary Judgment (Docket Entry 74); and (4) Plaintiffs' Motion for Summary Judgment (Docket Entry 81). (See Docket Entries dated Dec. 21, 2012; see also Docket Entries dated Nov. 5, 2009 and Oct. 31, 2011 (designating case as subject to handling pursuant to this Court's Amended Standing Order No. 30 and assigning case to undersigned Magistrate Judge, respectively).) For the reasons that follow, Plaintiffs' Motion to Strike and for Sanctions should be granted in

part and denied in part,[1] and each of the summary judgment motions should be granted in part and denied in part.

## I. BACKGROUND

Plaintiff Bobby Slate and various corporate Plaintiff entities of which Slate is the "president and principal" (Docket Entry 12, ¶ 1) commenced this action in Forsyth County Superior Court by filing a Complaint against Defendants Rhonda L. Byrd ("Rhonda"), Joseph Byrd ("Joseph"), Charles D. Washington ("Charles"), Quincy Washington ("Quincy"), John S. Washington ("John") and B23 Holdings, LLC, alleging claims arising from Rhonda's "scheme to embezzle funds and property from [P]laintiffs and convert them to her own use, benefit and enjoyment, or to that of other family members, especially [Joseph]." (Docket Entry 1-2 at 3.)[2] Plaintiffs later amended their Complaint to include Defendant Southern Community Bank and Trust ("SCB") (see Docket Entry 3) and

---

[1] As set forth in Section II, Plaintiffs' Motion to Strike and for Sanctions pertains to Southern Community Bank and Trust's Motion for Summary Judgment. Recent decisions have taken differing approaches as to the use by Magistrate Judges of recommendations or orders to address such motions to strike. Compare Harrison v. International Catastrophic Ins. Managers, LLC, No. 1:10CV683, 2012 WL 1231071 (E.D. Tex. Mar. 22, 2012) (unpublished), recommendation adopted, 2012 WL 1232020 (E.D. Tex. Apr. 12, 2012) (unpublished), with Foreword Magazine, Inc. v. Overdrive, Inc., No. 1:10CV1144, 2011 WL 5169384 (W.D. Mich. Oct. 31, 2011) (unpublished). Under these circumstances, the undersigned Magistrate Judge elects to enter a recommendation.

[2] The corporate Plaintiffs are: Slate Marketing, Inc.; Slate Retail Systems, Inc.; La Casa Homes of NC, Inc.; La Casa Real Estate Development, LLC; La Casa Real Estate & Investments of SC, LLC; The Commons at Archdale, Inc.; Palmetto Shores of Columbia, Inc.; La Casa Homes, Inc.; and Blythewood Residential Development, Inc. (Docket Entry 1-1 at 1.)

-2-

subsequently filed a Second Amended Complaint adding a host of corporate Defendant entities that Plaintiffs allege are "owned or controlled" by certain of the individual Defendants and which Rhonda and Charles allegedly utilized in the above-referenced embezzlement scheme (Docket Entry 12, ¶¶ 5, 47-58).[3]

The Second Amended Complaint asserts 17 unspecified "Claims for Relief" which appear to arise from four separate events or series of events. The factual scenario at the heart of 12 those 17 claims for relief relates to Rhonda and Charles's alleged embezzlement via unauthorized accounts at SCB (the "SCB Conversion"). The remaining five claims for relief each address a separate factual scenario.

## A. SCB Conversion

With respect to the SCB Conversion, the record before the Court reveals the following:

Corporate Plaintiff Slate Marketing, owned by Slate, hired Rhonda in 1991. (Id., ¶ 7.) In 2005, Slate created La Casa Real Estate and Investment, LLC ("La Casa"). (See Docket Entry 89-5 at 3.)[4] La Casa hired Charles in 2006. (Docket Entry 83-1, ¶ 13.) At the time, Charles's nephew Quincy worked as a "relationship banker" at SCB. (Docket Entry 90-9 at 13-14.)

_____

[3] The corporate Defendants that Plaintiffs added by way of the Second Amended Complaint are: Ascott Kelly Group of NC, Inc.; Ascott Kelly Hospitality Group, Inc; AK Holdings I, LLC; A K Holdings II, LLC; A K Holdings SC I, LLC; Windsor Holdings I, LLC; Ellison & Howell Properties, Inc.; QuintonEli Development, Inc.; and Byrd Services, Inc. (Docket Entry 12 at 1.)

[4] Pin citations refer to the pagination in the CM/ECF footer.

-3-

On July 25, 2005, SCB Chief Executive Officer ("CEO") Scott Bauer and Slate agreed to $1,000,000 and $675,000 loan commitments between SCB and La Casa.  (See Docket Entry 100-23.)[5]  As a "condition precedent," that arrangement required a deposit relationship "in the name of La Casa [] and a personal account of the guarantor with [SCB]."  (Id. at 3.)  The $1,000,000 loan commitment also required collateral in the form of "a first lien on marketable securities held in a U-Vest Account managed by Southern Community Advisors in the amount of $333,333."  (Id. at 2.)  There is no dispute that Slate agreed to and signed the loan commitment documentation.  (See id. at 5; Docket Entry 83-1, ¶ 16.)

---

[5] SCB contends that "Exhibits 2-25 and 34-35 to [P]lainitffs' response brief [(Docket Entry 100)] are unauthenticated documents which should not be considered, unless properly authenticated elsewhere in the record."  (Docket Entry 114 at 10 n.16 (citing Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993)).)  However, "[t]he 2010 amendment to [Federal] Rule [of Civil Procedure] 56 changed the procedure for submitting materials on summary judgment."  Ridgell v. Astrue, Civil Action No. DKC 10-3280, 2012 WL 707008, at *9 (D. Md. Mar. 2, 2012) (unpublished).  "The new rule eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated."  Id. (internal quotation marks omitted).  Under the new rule, "if the opposing party believes that [the cited] materials 'cannot be presented in a form that would be admissible in evidence,' that party must file an objection."  Foreword Magazine, Inc. v. OverDrive, Inc., No. 1:10-c-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011) (unpublished) (quoting Fed. R. Civ. P. 56(c)(2)).  Because SCB has not filed an objection contending that the cited material "cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2) (emphasis added), no basis exists for the Court to decline consideration of the material at issue, see Foreword Magazine, 2011 WL 5169384, at *2 ("Significantly, the objection contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be.").

An LLC Authorization Resolution establishing the required deposit relationship between La Casa and SCB bears a date of July 27, 2005, and appears to grant Rhonda (along with Slate) authorization to "[e]xercise all of the powers listed in th[e] resolution" on behalf of La Casa, including "[o]pen[ing] any deposit or share account(s) in the name of [La Casa]" and "[e]ndors[ing] checks and orders for the payment of money or otherwise withdraw or transfer funds on deposit with [SCB]." (Docket Entry 100-6 at 2.) Slate, despite recalling an awareness of the line of credit itself and the establishment of the required U-Vest collateral account (see Docket Entry 90-6 at 16), denies any recollection of the creation of a deposit relationship at that time (id.). In the face of a signature that Slate acknowledges is "very similar to [his] signature" (id. at 23) appearing a total of three times on that resolution and corresponding signature card, Slate maintains that the document is a forgery (id.; see also Docket Entry 83-1, ¶ 18). He bases that opinion on the presence of certain "handwritten information" in areas establishing which individuals have certain authorizations with respect to the account (Docket Entry 90-6 at 23; see also Docket Entry 100-23). Of note, in a similar authorization dated July 28, 2005, establishing the loan and line of credit, those same fields appear in type. (See Docket Entry 100-22.)

Slate maintains that Rhonda was never an officer of Slate Marketing and/or La Casa with authority to sign for or bind either

company. (See Docket Entry 90-6 at 28, 33-34.)[6] However, Rhonda signed numerous contracts on behalf of Slate entities, including La Casa. (See, e.g., Docket Entries 75-1 - 75-5.) Moreover, Slate acknowledges that an Amendment to the La Casa Operating Agreement, dated January 16, 2006, purports to add Rhonda as a manager of the company, but Slate again claims that his signature on that document is a forgery. (See Docket Entry 83-1, ¶ 20.) He avers that, "due to a family emergency, [he] was not present in the office the day the document was executed." (Id.) In addition, a Statutory Short Form of General Power of Attorney, executed on March 30, 2006, with the apparent initials and signature of Slate, grants Rhonda the authority to act as Slate's attorney-in-fact with respect to real property and banking transactions. (See Docket Entry 114-1 at 36-37.) Two witnesses, including Slate's long-time attorney James Iseman, attested to Slate's signature on that document. (See id. at 38.)[7]

---

[6] No Party argues that Charles had authority to sign on behalf of Slate or any of Slate's entities.

[7] Although titled a general power of attorney, beneath the powers granted, the document in question states in italics:

*RHONDA L. BYRD shall specifically have the authority to sign, execute, and deliver in my name all documents pertaining to the purchase of real estate by La Casa Real Estate & Investment, LLC known as The Commons at Archdale in Charleston, S.C. including any loan documentation and personal guaranties as required or requested by BB&T which financial institution is providing the financing for the acquisition of the aforesaid property.*

(Docket Entry 114 at 37.)

After the opening of the SCB account, Quincy handled most of the transactions. (See Docket Entry 100-1 at 9.) In November 2007, SCB security officer Todd Osborne took notice of the La Casa deposit account because of non-sufficient funds ("NSF") issues and the frequency of activity between it and another account belonging to a separate Slate entity. (See Docket Entry 100-28 at 6; see also Docket Entry 100-5.) In response to an inquiry from Osborne regarding whether there is "any thing [he] need[s] to be worried about" on that account (Docket Entry 100-5 at 3), Quincy explained:

> La Casa [] is a business [Slate] started. He is the President of Slate Marketing, and his net worth is somewhere around $80MM. My uncle [Charles] works for La Casa is how I got this acct. My uncle is the right-hand man along side Rhonda Byrd. The acct my [sic] go in the negative, but the funds are always made good within 24 hrs. There is no need to worry about this account. La Casa used to have a $1MM operating line of credit, but we lost it to BB&T do [sic] to one of our own Commercial Bankers not getting the due diligence done in an appropriate time.

(Id. at 2.)

According to Osborne, the foregoing response constituted his first indication that Quincy's uncle worked for La Casa. (See Docket Entry 100-28 at 14.) Osborne also testified that Quincy's response satisfied any concerns Osborne may have had at the time because "[Quincy] explained that these were . . . related companies [and] it's not uncommon for businesses that have common ownership to intermingle funds" and because the NSF issue on the account was resolved that day. (Id. at 14-15.) Regardless, Osborne cautioned Quincy:

-7-

> Just be careful and don't get yourself in a bad
> situation, especially if you are handling NSF decisions
> for the branch, which I think you do. Don't let your
> family relationship with this customer come back and bite
> you. Make sure you are consistent with bank policies in
> regard to fees, paying items, etc.

(Docket Entry 100-5 at 2.)

On February 6, 2008, a compliance officer at SCB noticed further irregularities on the La Casa deposit account:

> I noticed the check being returned (and 2 other deposits)
> are from companies that Rhonda [] is the signer.
> 155000.00 deposited on 1-28-2008 is from Slate Marketing
> with Rhonda as the signer (First Citizens Bank) 20000.00
> deposited on 2-1-2008 Also from Palmetto Shores with
> Rhonda as the signer. (BB&T) All three located say there
> [sic] are at the same address. 250 W. first St Suite 400
> Winston Salem, NC 27101

> **Also there is a check for 140000.00 pd on 1-31-2008
> going back to Slate Marketing that I guess was returned.
> I have a copy of it, but do not see where it hit the
> account.

> This looks odd to me.

(Docket Entry 100-25 at 2 (erratic punctuation, capitalization and grammar in original).) Later that day and into the next, Osborne and Quincy revisited their discussion of the La Casa deposit account via email. (See Docket Entry 100-3.) Quincy again offered some background information, including his understanding of some of the irregular account activity and NSF issues:

> [La Casa] is run by [] Slate, Rhonda [] and Charles [].
> [] Slate owns Slate Marketing, [La Casa], and Palmetto
> Shores of Columbia. Rhonda is basically [Slate]'s
> personal asst, so she has signing authority in all three
> businesses. [Slate] started [La Casa] when he started
> investing in property in the Atlantic Beach area. Shortly
> after that [La Casa] was building in Columbia, SC. That
> is when Palmetto Shores of Columbia was started.

> [La Casa] checking accts were originally opened when I
> spoke to my uncle and Rhonda about moving some of Slate
> Marketing's accts here from First Citizens. They met
> with Scott Bauer and Steele Hall. Steele Hall was
> supposed to be getting a due diligence done, but never
> got it done after a month or so. [La Casa] went to BB&T,
> and the due diligence was done in two weeks or less.
> Right after that [La Casa] moved their $1MM operating
> line of credit and two checking accounts to BB&T. I was
> able to speak with Rhonda and keep the one business acct
> here.
>
> The way it was explained to me is that when checks are
> written they must be paid out of certain accts.
> Therefore; [sic] Rhonda will transfer funds so she can
> write the checks out of the specified acct. As far as
> the $140K, with all of the traveling they have to do they
> forgot to make the transfer to cover the check. Once
> they realized they forgot to make the deposit, there were
> checks out and it was too late.

(Id. at 3.)

In response to Quincy's email, and apparently referring to a
separate, but related, conversation between the two, Osborne asked:
"Did I understand right in our conversation that, to the best of
your knowledge, Mr. Slate believes all of his accounts with [SCB]
were closed . . . and he is unaware that this account is still
open?" (Id.) Quincy responded: "All I am 100% sure of is that I
was told he wanted to close everything, but before that took place
I spoke with Rhonda about trying to keep at least one acct. She
came back to me stating we could keep one." (Id. at 2.) Osborne
concluded:

> I think you and I agree that we would be better off
> closing this account. . . . It concerns me that they are
> bringing in these big deposits right a [sic] closing and
> then wanting official checks before the branch opens in
> the morning. All of these items are signed by the same
> maker. If the decision is made not to close, then
> another member of the [] staff needs to handle this
> account. Holds need to be placed due to the excessive

> NSF activity. Official checks should only be given on collected funds. Also remember that items over 25k require manager's approval.

(Id.)

Rhonda and Charles learned that SCB made the decision to close the La Casa deposit account shortly after the foregoing discussion between Osborne and Quincy, as reflected by the following email exchange:

Charles to Quincy, February 8, 2008, at 9:56 AM:

> Rhonda is extremely upset that [SCB] is closing the account. I told her that it is best and she really needs to get her act together. There are additional checks scheduled to come through.
>
> How do we handle?

Quincy to Charles, February 8, 2008, at 10:02 AM:

> See, that's what they are looking at . . . checks coming in causing the acct to go into the negative and funds being deposited right after that or right before. Last year alone you all had $1,054 in NSF. This all comes back on me being the one that opened the acct and handles all of the transactions.

Charles to Quincy, February 8, 2008, at 10:07 AM:

> She is worried about you now. I told her about last [sic] email and now she is really upset. Just want to know if and how this may affect you so she can inform [Slate] and admit to him what she has done . . . . . . Not Good!

Quincy to Charles, February 8, 2008, at 10:12 AM:

> I got worried myself when [SCB's] Security Officer came here yesterday. I could lose my job, but I really don't think they are going that far with it. The reason being is b/c many of the checks you all deposited should have had holds placed on them with the history of NSF. On top of that, we all issued official checks on funds that were not collected.

Charles to Quincy, February 8, 2008 at 10:27 AM:

-10-

> We never received an official check on funds that returned [sic]. I would argue that fact with whomever. Rhonda would never ever kite checks. [Slate] has too much money for that.

Quincy to Charles, February 8, 2008, at 10:32 AM:

> We did in January.

(Docket Entry 100-8 at 1-4.)

A more formal email exchange occurred between Rhonda and Quincy on February 13, 2008:

Rhonda to Quincy, February 13, 2008, at 11:10 AM:

> Quincy,
>
> Thank you for closing our account at [SCB]. It has been a pleasure working with you and the staff there . . . . I have just received word that a check was returned on our account there for $5000 made to one of our employees. Would you please explain why that item was returned when necessary funds where [sic] available to clear that check.
>
> Thanks
>
> Rhonda Byrd
> Managing Officer

Quincy to Rhonda, February 13, 2008, at 11:11 AM:

> I appreciate the opportunity so much!
>
> The signature on the returned check did not match your signature on file.

Rhonda to Quincy, February 13, 2008, at 11:35 AM:

> Thank you Quincy. I've enjoyed working with you. We're moving our account over to BB&T to meet a loan requirement and that is the reason I've asked you to close the account. I'm sorry the signature was confusing. I do sign all checks for several entities for La Casa and the Slate Companies and sometimes the other banks will call me to verify my signature because I don't always take time to sign appropriately and I'll even scribble my name and cause issues with the matching process. I'm sorry it caused a problem but I'll cover

-11-

the check on my end that was returned.  Also, we have a
direct draft from this account to Southern Community for
a loan payment.  Please advise on how to get this set up
elsewhere.

Take Care,

Rhonda Byrd
Managing Officer

(Docket Entry 100-11 at 2-3.)

That evening, Rhonda sent the following email to Charles:

Hey,

If you get this, call me.  I'm still thinking about this
mess.  I may write down what I want to say to Scott in
the morning but I am concerned about what I can and can't
say as far as Quincy's involvement is concerned.

Rhonda

Sorry.  I don't mean to drive you nuts.  I've just never
been through anything like this.

(Docket Entry 100-10.)

Per Plaintiffs, Rhonda and Charles used the La Casa deposit
account for both legitimate and illegitimate business purposes from
its inception in 2005 until its closing in February 2008 (see
Docket Entry 90-8 at 4-5; Docket Entry 83-2 at 4-26), amounting to
total embezzlement losses of over $2,000,000 (see Docket Entry 90-8
at 8).  The Second Amended Complaint's Second, Third, Fifth, Sixth,
Seventh, Eighth, Ninth, Tenth, Twelfth, Thirteenth, Fourteenth, and
Sixteenth "Claims for Relief," asserted against Rhonda, Charles,
Quincy, and SCB, appear to relate to the SCB Conversion.
Specifically, the Second Claim for Relief appears to assert a claim
for conversion against Charles and Rhonda (Docket Entry 12, ¶¶ 11-
14); the Third a claim for breach of fiduciary duty against Rhonda

-12-

(id., ¶¶ 15-17); the Fifth a claim for conversion and conspiracy to commit conversion and/or fraud against Quincy and, by way of respondeat superior, SCB (id., ¶¶ 23-25); the Sixth a claim for breach of fiduciary duty against Quincy and, by way of respondeat superior, SCB (id., ¶¶ 26-28); the Seventh a claim for negligence against Quincy and, by way of respondeat superior, SCB (id., ¶¶ 29-31); the Eighth a claim for breach of fiduciary duty against SCB (id., ¶¶ 32-35); the Ninth a claim for negligence against SCB (id., ¶¶ 36-38); the Tenth a claim for negligent supervision and retention against SCB (id., ¶¶ 39-42); the Twelfth a claim for fraudulent transfer against the corporate Defendants (other than SCB and Byrd Services, Inc.) and, by way of respondeat superior, Rhonda and Charles (id., ¶¶ 47-58); the Thirteenth a claim for fraudulent transfer against Byrd Services, Inc. and, by way of respondeat superior, Rhonda and Joseph (id., ¶¶ 59-63); the Fourteenth a claim for fraud against Rhonda and Charles (id., ¶¶ 64-66); and the Sixteenth a claim for violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., against Rhonda, Joseph, Charles, John and Quincy (id., ¶¶ 70-76).

## B. Remaining Claims

Four of the five remaining "Claims for Relief" (the First, Fourth, Eleventh, and Fifteenth) each address factual scenarios unrelated to the SCB Conversion. Plaintiffs' "First Claim for Relief" alleges that "Rhonda [] was employed as a bookkeeper and administrative assistant by [P]laintiff Slate Marketing, Inc."

-13-

(Docket Entry 12, ¶ 7), and, through that role, embezzled over $1,000,000 in excess payroll over her 17-year employment period (the "Payroll Conversion"). (See id., ¶¶ 1-10.)[8] The "Fourth Claim for Relief" alleges that Rhonda, Charles and John "defrauded [] Slate and La Casa out of the sum of $127,920 for the purchase of a vacation home in High Meadows, Alleghany County, NC for [] Charles and John" (the "High Meadows Conversion"). (Docket Entry 12, ¶ 19.) The "Eleventh Claim for Relief" alleges that "Rhonda [] had access to a safe deposit box of [] Slate at [First Citizens Bank] from which she removed . . . an engagement ring and other jewelry owned by [] Slate" (the "Jewelry Conversion"). (Id., ¶ 45.) Plaintiffs' "Fifteenth Claim for Relief" alleges that "Rhonda [] and Charles [] defrauded [] Slate by persuading him to refinance the loan on his personal residence . . . . Not only were the loan proceeds of $127,653.13 embezzled by these [D]efendants, but also the sum of $125,000 was drawn down on an equity line of credit later set up by these [D]efendants in July 2005" (the "Refinancing Conversion"). (Id., ¶ 68.)

Finally, Plaintiffs' "Seventeenth Claim for Relief" states that, "[f]or each of the above causes of action, [D]efendants are liable to [P]laintiffs for both compensatory and punitive damages,

---

[8] Despite alleging said claim solely based on the activities of Rhonda, the Second Amended Complaint states: "As a proximate result of [Rhonda's] embezzlement, [P]laintiffs have been injured and damages in a sum in excess of $10,000 in actual and punitive damages, which [P]laintiffs are entitled to recover of [] Rhonda [], Joseph [], Byrd Services, Inc., Charles [], John [] and Quincy [], jointly and severally, with interest allowed by law." (Docket Entry 12, ¶ 10.)

-14-

as each of these claims was committed by [D]efendants through one or more of the following aggravating factors: fraud, malice, and wilful and wanton conduct, and concealed from [P]laintiffs and not reasonably subject to discovery until on or after May 2008." (Id., ¶ 78.)

## II. MOTION TO STRIKE AND FOR SANCTIONS

Plaintiffs "move this [C]ourt to strike the affidavits of [Rhonda and Charles] submitted [by SCB] in support of [SCB's Motion for Summary Judgment]" and, as a further sanction, "to strike SCB's motion for summary judgment" in its entirety. (Docket Entry 94 at 2.) As grounds for those proposed actions, Plaintiffs note that Rhonda and Charles were indicted by a Forsyth County grand jury in January 2009 for the conduct at the center of this civil suit (see Docket Entry 95 at 2) and, because of those pending criminal charges, "have invoked their Fifth Amendment privilege against self-incrimination to avoid answering any questions regarding their alleged embezzlement scheme" throughout this matter (id.). According to Plaintiffs, "[a]lthough [they] deposed [Rhonda] and [Charles], both [D]efendants refused to testify at their depositions other than to provide some background information." (Id.) Plaintiffs stress that, "of particular relevance to the instant [Motion to Strike], [Rhonda] and [Charles] specifically refused to answer any questions concerning their roles with [P]laintiff companies, the opening of the La Casa checking account, [] Slate's knowledge of this account, and Quincy['s] participation in opening and operating the account." (Id.)

-15-

Regarding their further efforts to acquire the deposition testimony of Rhonda and Charles, Plaintiffs recount:

> At no point in the time during the discovery period did [Rhonda and Charles] indicate any intent to revoke their Fifth Amendment privilege and provide testimony in this case. In fact, [P]laintiffs sent a letter to the attorney for [Rhonda] and [Charles] in August 2012, stating [P]laintiffs' continued desire to depose [Rhonda] and [Charles] if they intended to revoke the privilege, and asking counsel to respond if this was the case. Plaintiffs received no response to this letter, which was sent to all parties in this matter, including SCB.

(Id. at 3.) Plaintiffs thus argue that the Court should bar Rhonda and Charles "from offering self-serving affidavits in support of SCB's motion to dismiss [sic] now that discovery has ended" (id. at 6) and that "SCB is culpable for waiting until after the close of discovery to procure testimony from [Rhonda] and [Charles] despite knowing that they had previously invoked their Fifth Amendment privilege and refused to testify regarding the same subjects" (Docket Entry 117 at 10). According to Plaintiffs, "[i]t is apparent that SCB had planned this action for several days if not weeks [and] SCB failed to correct its arguments in its Reply brief on the Iseman motion to compel and tell the [C]ourt that it had now procured the testimony of [Rhonda] and [Charles]." (Id.)[9]

SCB responds that it "had no control over the invocation of the Fifth Amendment privilege by Rhonda and Charles, or how counsel

---

[9] Plaintiffs reference SCB's prior motion to compel the testimony of Slate's long-time attorney James Iseman (Docket Entry 63), which testimony Plaintiffs represented (in connection with with a related motion to quash (Docket Entry 58) and said motion to compel) that they required, in part, because Rhonda had taken the Fifth Amendment. (See Docket Entry 61 at 10; Docket Entry 64 at 4.)

-16-

for Rhonda and Charles did or did not respond to the August letter." (Docket Entry 111 at 4-5.) Moreover, SCB contends that the Court should not strike the affidavits because "Rhonda and Charles are not submitting affidavits in support of their own motion or defense. Rather, the affidavits are being offered by [SCB] - which had no say in whether Rhonda and Charles invoked the privilege." (Id. at 7.) In addition, SCB argues that regardless of what the Court decides as to the striking of the affidavits, no ground exists to strike its summary judgment motion because, "even without the affidavits of Rhonda and Charles, [SCB]'s summary judgment motion is amply supported by 11 other affidavits, extensive deposition testimony, written discovery materials and the pleadings." (Id. at 12.)

The United States Court of Appeals for the Fourth Circuit has held that "the Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a summary judgment motion." Edmond v. Consumer Prot. Div. (In re Edmond), 934 F.2d 1304, 1308 (4th Cir. 1991). In order to prevent such abuses, the Court has the power to "strike the testimony of a witness . . . ." U.S. v. $133,420.00 in U.S. Currency, 672 F.3d 629, 640 (9th Cir. 2012); see also id. at 641 (discussing applicability in both criminal and civil contexts). Allowing introduction into the record of material as to which Rhonda and Charles blocked discovery would constitute an abuse of the Fifth Amendment. In other words, "regardless of who benefits from the testimony, it is not fair to admit [the

-17-

challenged evidence] . . ., when [no] party has had the opportunity to depose [the affiant who previously invoked the Fifth Amendment] and to flesh out the circumstances of her account and her motivations." Barker v. International Union of Operating Eng'rs Local 150, No. 08C50015, 2011 WL 6338800, at *3 (N.D. Ill. Dec. 19, 2011) (unpublished).

Moreover, no basis exists for SCB's contention that "any potential prejudice to [P]laintiffs can easily be cured by allowing depositions of Rhonda and Charles now." (Docket Entry 111 at 5.) The record contains no basis for the Court to conclude that Rhonda and Charles would now submit to a deposition by Plaintiffs. SCB offers only the equivocal and speculative statement that, "[i]f [P]laintiffs were to ask again in light of the affidavits, Rhonda and Charles may now voluntarily submit to depositions." (Id. at 7 n.3 (emphasis added).)

In addition, given that the discovery period ended on October 1, 2012, and that this case is set for trial in April 2013, even if Rhonda and Charles did waive their Fifth Amendment privilege at this juncture, the Court should recognize that "withdrawing the Fifth Amendment privilege at a late stage places the opposing party at a significant disadvantage because of increased costs, delays, and the need for a new investigation." Davis-Lynch, Inc. v. Moreno, 667 F.3d 539, 548 (5th Cir. 2012). "[A] litigant who provides previously withheld information at summary judgment places the opposing party at a significant disadvantage in responding to such information." Id. Moreover, allowing further discovery -

-18-

likely requiring a renewed round of summary judgment briefing - would imperil the scheduled trial date, which the Court has an independent interest in preserving. See, e.g., Kinetic Concepts, Inc. v. Convatec Inc., No. 1:08CV918, 2010 WL 1418312, at *4 (M.D.N.C. Apr. 2, 2010) (unpublished).

Accordingly, the Court should decline to consider the affidavits of Rhonda and Charles at this stage. See Cutting Underwater Techs. USA, Inc. v. EI U.S. Operating Co., 671 F.3d 512, 515 (5th Cir. 2012) ("Under the now-applicable Rule 56(c)(2), . . . it is no longer necessary for a party to file [a motion to strike]; instead, the party may simply object to the material. See Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments ('There is no need to make a separate motion to strike.'). In light of this change, [the party's] Motion to Strike will be treated as an objection."). The Court, however, should not strike SCB's summary judgment motion in its entirety given that counsel for Plaintiffs has acknowledged that SCB and its counsel did not act in bad faith. (See Docket Entry 111-5 at 2.)[10]

---

[10] The Court, however, may wish to admonish SCB's counsel for failing to withdraw or correct its prior argument, asserted in its briefs opposing a Motion to Quash (Docket Entry 58) and supporting its Motion to Compel (Docket Entry 63), that the deposition testimony of Slate's long-time attorney James Iseman was necessary, in part, because Rhonda refused to testify (see Docket Entry 61 at 10 (asserting, under heading "The Deposition is Necessary," that SCB "has sufficient need to depose Iseman . . . [because] the only other person clearly involved in the listing of [Rhonda] as an officer and manager on corporate documents is [Rhonda], who has refused to answer questions in this case based on Fifth Amendment privilege"); see also Docket Entry 64 at 4 ("The sufficient legal basis for taking Iseman's deposition is detailed in SCB's Response (continued...)

-19-

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Such a genuine dispute exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In making this determination, the Court must view the evidence and any reasonable inferences therefrom in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The party moving for summary judgment may discharge its burden by identifying an absence of evidence to support the non-moving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-moving party then must "set forth specific facts showing that there is a *genuine issue for trial*." Matsushita Elec. Indus., 475 U.S. at 586–87 (citation omitted) (emphasis in original). In this regard, the non-moving party must convince the Court that evidence exists upon which a finder of fact could properly return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 252 (citation omitted); see also Francis v.

---

[10](...continued)
to Plaintiffs' Motion to Quash [(Docket Entry 61)]."). SCB's Reply in support of its Motion to Compel, filed after SCB obtained the affidavits of Rhonda and Charles, fails to mention this material change. (See Docket Entry 92.)

<u>Booz, Allen & Hamilton, Inc.</u>, 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

To the extent the Court must draw conclusions about matters of North Carolina law in evaluating the instant Motion,[11] "the highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted." <u>West v. American Tel. & Tel. Co.</u>, 311 U.S. 223, 236 (1940). However, "[a] state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them." <u>Id.</u>

Accordingly, "it is the duty of [a federal court facing a question of state law] to ascertain from all the available data what the state law is and apply it . . . ." <u>Id.</u> at 237. "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal

_____

[11] The Parties appear in agreement that North Carolina law governs the relevant state law aspects of the instant matter. (<u>See</u> Docket Entries 71, 76, 83, 90.)

court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Id.

## B. John's Motion for Summary Judgment

By way of his instant Motion, John notes that "the only allegations against [him] are set forth in paragraphs 18-22 and 71 of the Second Amended Complaint." (Docket Entry 71 at 2.) Those paragraphs state:

18. Plaintiffs reallege the allegations contained in paragraphs 1 through 17 of the [S]econd [A]mended [C]ompaint, which are incorporated by reference herein as if the same were fully set forth.

19. [] Rhonda [], Charles [] and John [] defrauded [] Slate and La Casa out of the sum of $127,920 for the purchase of a vacation home in High Meadows, Alleghany County, NC[,] for [] Charles and John []. On or about August 5, 2005, [] Rhonda [] and Charles [] persuaded [] Slate to loan the above sum to [Charles and John] for the purchase of this property.

20. Thereafter, [Charles and John] purchased the property and executed a mortgage in favor of [] La Casa, listing [] Slate as member-manager. [] Rhonda [] repeatedly assured [] Slate that [Charles and John] were making payments on their indebtedness.

21. In June 2007, however, Rhonda [] cancelled the promissory note and deed of trust without the knowledge or consent of [P]laintiffs, purporting to act as member manager of La Casa. [Charles and John] then refinanced the property with Grayson National Bank and, upon information and belief, applied the proceeds of the loan from [] Slate to pay off a second mortgage to renovate the vacation home located on the property.

22. As a proximate result of the fraud and false pretenses perpetrated by [] Rhonda [] and Charles and John [], [] Slate and La Casa have been injured and damaged in a sum in excess of $10,000 in actual and punitive damages, which these [P]laintiffs are entitled to recover of these [D]efendants, jointly

-22-

and severally, with interest allowed by law.  In addition, [P]laintiffs sustained special damages proximately caused by these [D]efendants in the form of lost profits, lost business opportunities, injury to business reputation, impaired banking relationships and other consequential and incidental damages which [P]laintiffs are entitled to recover of these [D]efendants.

. . . .

71.  [] Rhonda [], Joseph [], Charles [], John [] and Quincy [] participated in a continuous scheme to defraud [P]laintiffs and obtain money through embezzlement and false pretenses as described in the preceding averments.  This continuous scheme, beginning no later than August, 2005 and ending April, 2008, sought to defraud [P]laintiffs through embezzlement, forgery of banking instruments, conversion of property, and other activities as outlined in the previous averments.

(Docket Entry 12, ¶¶ 18-22, 71.)  John's instant Motion concludes that "Plaintiffs [sic] causes of action against [John] fail as there is no evidence of <u>fraud</u>." (Docket Entry 71 at 3 (emphasis added).)

By way of their Response, Plaintiffs contend:

Plaintiffs have pled and proven other claims against John in addition to fraud.  The first claim for relief in the [S]econd [A]mended [C]omplaint [] asserts claims for embezzlement against [Rhonda] and the other individual [D]efendants.  In particular, it states that "[Rhonda] also embezzled funds from [P]laintiffs with the knowledge and for the benefit of Joseph [], Byrd Services, Inc., Charles [], and Quincy [], and these [D]efendants knowingly received embezzled funds from Rhonda []."  [(Docket Entry 12, ¶ 9)] (emphasis added).  Paragraph 10 of the [Second Amended] [C]omplaint states that [P]laintiffs are entitled to recover their damages resulting from [Rhonda]'s embezzlement from the same [D]efendants identified in paragraph 9, including John.  Similarly, in the second claim for relief stated in the [Second Amended] [C]omplaint, [P]laintiffs allege that John "encouraged, participated in and promoted [Rhonda and Charles's] embezzlements."  [(<u>Id.</u>, ¶ 14.)]  Plaintiffs allege that the embezzlements in this second

-23-

> claim were from "unauthorized banking and credit card
> accounts" at various banks. (Id.) In the fourth claim
> in the [Second Amended] [C]omplaint, [P]laintiffs assert
> the claim of fraud related to the issuance and
> cancellation of the High Meadows Note that is the sole
> claim challenged in John's brief. (Id. ¶¶ 18-22.) In
> the sixteenth claim, [P]laintiffs accuse John of
> participating in RICO activities with the other
> [D]efendants. (Id. ¶¶ 70-76.) Thus, in addition to the
> claim for fraud related to the Note, [P]laintiffs'
> [Second Amended] [C]omplaint alleges that John knowingly
> participated in the embezzlement scheme of [Rhonda] and
> Charles and knowingly received proceeds from this scheme.

(Docket Entry 98 at 4-5 (emphasis in original).) Plaintiffs'

Response Brief proceeds with a discussion divided into three sub-

sections: (1) "John [] is Liable for Civil Conspiracy to Commit

Conversion and Fraud" (id. at 5-10); (2) "RICO" (id. at 10); and

(3) "Fraudulent Transfer" (id. at 10-12). John did not reply.

(See Docket Entries dated Dec. 3, 2012, to present.) Because

John's summary judgment motion and related brief address only the

fraud claim, this Memorandum Opinion will not analyze the other

bases of liability asserted against John by Plaintiffs, except

RICO, as to which, in light of the discussion in Section III.C.v.,

the Court should enter judgment as a matter of law for John.

Under North Carolina law, fraud requires the following

elements: "(1) [f]alse representation or concealment of a material

fact, (2) reasonably calculated to deceive, (3) made with the

intent to deceive, (4) which does in fact deceive, (5) resulting in

damage to the injured party." Ragsdale v. Kennedy, 286 N.C. 130,

138, 209 S.E.2d 494, 500 (1974). The record evidence before the

Court fails to support allegations that John made any

representations to Plaintiffs, false or otherwise. In fact, at

-24-

most, the record evidence reveals that John may have benefitted from the alleged embezzlement scheme by way of his enjoyment of the High Meadows home and certain items purchased for that home by Charles (see, e.g., Docket Entry 70-1, ¶ 9) and by way of Rhonda's forgiveness of the promissory note bearing his name (see Docket Entries 100-14, 100-16). Such evidence, however, does not support a claim for fraud.

John's summary judgment motion should be granted in part in that the Court should enter judgment as a matter of law as to the fraud and RICO claim(s), but denied as to the other bases of liability that Plaintiffs assert, as John did not address those claims by way of briefing.

### C. Quincy's Motion for Summary Judgment

Quincy identifies, and moves for summary judgment on, the following causes of action: "Negligence (Second Claim for Relief)" (Docket Entry 76 at 6); "Fraud/fraudulent concealment (Fifth Claim for Relief)" (id. at 5); "Breach of Fiduciary Duty (Sixth Claim for Relief)" (id. at 6.); "RICO (Sixteenth Claim for Relief)" (id.); and "Punitive Damages (Seventeenth Claim for Relief)" (id.). Plaintiffs' Response agrees with that description of the claims at issue, but adds "[conversion] and conspiracy to commit [conversion]

-25-

(First Claim)" (Docket Entry 99 at 8).[12]  Quincy's Reply addresses

the conversion claim as well.  (<u>See</u> Docket Entry 112 at 4.)

### i. <u>Conversion/Conspiracy to Commit Conversion</u>[13]

Under North Carolina law, "[t]he tort of conversion is well

defined as 'an unauthorized assumption and exercise of the right of

ownership over goods or personal chattels belonging to another, to

the alteration of their condition or the exclusion of an owner's

rights.'" <u>Peed v. Burleson's, Inc.</u>, 244 N.C. 437, 439, 94 S.E.2d

351, 353 (1956) (quoting 89 C.J.S., <u>Trover & Conversion</u>, § 1).

Plaintiffs contend:

> Quincy converted the property of [P]laintiffs to his own
> use.  Specifically, Quincy converted [P]laintiffs' money
> into gifts of jewelry and clothes for himself, his wife,

---

[12] Although Plaintiffs identify the First Claim for Relief as embezzlement, Plaintiffs discuss that claim in terms of conversion (<u>see</u> Docket Entry 99 at 8-9) and the undersigned will do likewise. Moreover, as the discussion that follows illustrates, although Plaintiffs label the conversion claim(s) against Quincy as "First Claim," which would be the Payroll Conversion, the cited evidence instead supports a claim for conversion of the La Casa deposit account funds, which also appears to be the focus of Plaintiffs' arguments on the issue (<u>see</u> Docket Entry 99 at 9).

[13] Plaintiffs' conversion claims appear to relate to the personal funds of Slate (by way of the Refinancing Conversion) and the corporate funds of La Casa (by way of the SCB Conversion and the High Meadows Conversion) and Slate Marketing (by way of the Payroll Conversion).  "[T]he general rule is that 'money may be the subject of an action for conversion *only* when it is capable of being identified and described.'"  <u>Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs.</u>, ___ N.C. ___, ___, 723 S.E.2d 744, 750 (2012) (quoting <u>Alderman v. Inmar Enters., Inc.</u>, 201 F. Supp. 2d 532, 548 (M.D.N.C. 2002), <u>aff'd</u>, 58 F. App'x 47 (4th Cir. 2003)).  No Party to this action disputes that the funds in question are subject to a conversion claim.  (<u>See</u> Docket Entries 71, 76, 83, 90.)  Moreover, the North Carolina Court of Appeals recognized a conversion claim on similar facts in <u>White v. Consolidated Planning, Inc.</u>, 166 N.C. App 283, 309-11, 603 S.E.2d 147, 165-66 (2004).

-26-

and his son; expensive dinners; and a motorcycle. Moreover, even if Quincy did not himself perform the conversion, Quincy knew that the conversion was occurring and agreed to receive the benefits of the conversion, such that he is liable for conspiracy to commit conversion.

(Docket Entry 99 at 9.)

Plaintiffs have identified no evidence that Quincy directly converted Plaintiffs' property. Although Plaintiffs reference "$20 out of the account paid by Quincy directly to himself [and] another $700 potentially paid to Quincy" (id. at 5), the record evidence cited by Plaintiffs to support these assertions lack any reference to a $20 payment and, as to the $700 payment, reflect only that when Plaintiffs' counsel asked "[w]here did the $700 go?" Quincy responded "I do not – as it stated in the – in the letters here, I do not recall." (Docket Entry 100-1 at 40.) This evidence does not support a conversion claim.

A genuine issue of material fact, however, does exist as to Plaintiffs' civil conspiracy theory. Under North Carolina law, civil conspiracy consists of the following elements: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." Strickland v. Hedrick, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72 (2008) (quotation marks and citations omitted); see also Byrd v. Hopson, 265 F. Supp. 2d 594, 599 (W.D.N.C. 2003) ("[I]n North Carolina, there is no independent cause of action for civil conspiracy; the claim can arise only

-27-

where there is an underlying claim for unlawful conduct."). "[A] conspiracy can be proven though the circumstantial evidence concerning the relations and conduct of the parties, the overt acts they committed, and the reasonable inferences that arise from these facts." First Fin. Sav. Bank., Inc. v. American Bankers of FL., Inc., Nos. 88-33-CIV-5-H, et al., 1990 WL 302790, at *3 (E.D.N.C. Apr. 17, 1990) (unpublished) (citing Dickens v. Puryear, 302 N.C. 437, 456, 276 S.E.2d 325, 337 (1981)). "While a party may prove an action for civil conspiracy by circumstantial evidence, sufficient evidence of the agreement must exist to create more than a suspicion or conjecture in order to justify submission of the issue to a jury." Speedway Promoters, Inc. v. Hooter's of Am., Inc., 123 F. Supp. 2d 956, 963 (W.D.N.C. 2000) (internal quotations marks, citations and ellipsis omitted).

The record evidence supports contentions that Charles purchased dinners for Quincy (see Docket Entry 112-1 at 3),[14] as well as clothes for Quincy and his son (see id.), and either loaned or gave Quincy $2,200.00 from La Casa account funds for the down payment on a motorcycle (see id. at 12).[15] In fact, with respect

---

[14] Although Quincy admits to Charles having occasionally purchased "dinners" in the past (see Docket Entry 112-1 at 3), he specifically denies that Charles purchased a gift card for Quincy and his wife to the Chop House (see id. at 12).

[15] During the course of Quincy's deposition, Plaintiffs' counsel repeatedly asked Quincy whether Charles had purchased jewelry, specifically rings, for Quincy and his wife. (See id. at 3, 12.) Quincy responded in the negative to each of those inquiries (see id.) and the record does not otherwise support Plaintiffs' contentions about jewelry.

to the motorcycle down payment, Quincy, in his deposition, appeared
to acknowledge that the funds Charles provided came from La Casa's
account. (See Docket Entry 100-1 at 42 ("Q. So, on the very same
day, in fact even the very same morning, that you got your
motorcycle, this transaction occurred and you helped that
transaction occur, correct? A. Correct.").) The record evidence
also reflects that Charles was "like a father figure" to Quincy
(see id. at 12), that, when discrepancies on the La Casa account
came to light, Quincy assured security personnel at SCB that
nothing amiss occurred (see Docket Entry 100-5 at 2), that Quincy
knew certain actions taken on the account could cost him his job
(see Docket Entry 100-8 at 2), and that, when the alleged
embezzlement scheme neared its ultimate discovery, Rhonda sent a
cryptic email to Charles noting concern "about what [she] can and
can't say as far as Quincy's involvement is concerned" (see Docket
Entry 100-10 at 2). A reasonable fact-finder, considering such
evidence, could conclude that Quincy conspired with Charles and
Rhonda for his own benefit and/or the benefit of his uncle to
convert La Casa account funds.

Accordingly, Quincy's summary judgment motion should be denied
as to the conversion claim (on a civil conspiracy theory).

## ii. Negligence

"To state a claim for common law negligence, a plaintiff must
allege: a legal duty, breach thereof, and injury proximately caused
by the breach." Fussell v. North Carolina Farm Bureau Mut. Ins.
Co., 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010). Plaintiffs

-29-

contend that Quincy "was negligent in performing [certain business] activities at [the] request [of Rhonda and Charles] and in failing to report [those activities] to a bank supervisor or to [P]laintiffs." (Docket Entry 12, ¶ 30.) Quincy "vigorously contend[s] that all of [] Plaintiffs' claims asserted against [him] are barred by the North Carolina Uniform Fiduciaries Act (UFA)." (Docket Entry 76 at 13.)

The UFA "relax[es] the common law standard of care owed by banks to principals when dealing with their fiduciaries." Edwards v. Northwestern Bank, 39 N.C. App. 261, 268, 250 S.E.2d 651, 656 (1979). In relevant part, the UFA provides:

> If a check is drawn upon the account of his principal in a bank by a fiduciary who is <u>empowered to draw checks upon his principal's account</u>, the bank is authorized to pay such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing such check, <u>or with knowledge of such facts that its action in paying the check amounts to bad faith</u>.

N.C. Gen. Stat. § 32-9 (emphasis added).

In this case, a genuine issue of material fact exists as to whether Rhonda was "empowered to draw checks," N.C. Gen. Stat. § 32-9, on La Casa's accounts and thus whether the UFA offers Quincy any protection. Slate averred that the LLC Authorization establishing the deposit account (and apparently granting Rhonda certain authority on the La Casa account) was forged. (See Docket Entry 83-1, ¶ 18.) As the record evidence otherwise would permit a reasonable fact-finder to conclude that Quincy negligently handled the account (e.g., failing to act in the face of noted

-30-

irregularities on the account (see Docket Entry 100-5 at 2) and taking actions he recognized could cost him his job (see Docket Entry 100-8 at 2)), the Court should deny Quincy's summary judgment motion on the negligence claim. See Willmott v. Federal St. Advisors, Inc., No. 05 C 1124, 2006 WL 3743716, at *5 (N.D. Ill. Dec. 19, 2006) (unpublished) ("While [the defendant] focuses on the absence of evidence of bad faith, the [c]ourt's analysis stops prior to any such argument-because there exists a genuine issue of material fact as to whether [the agent] was an 'authorized fiduciary' empowered to draw on the Loan Agreements such that the [UFA] would apply at all."); Zions First Nat'l Bank v. Clark Clinic Corp., 762 P.2d 1090, 1094-96 (Utah 1988) (denying summary judgment on UFA claims because of genuine issue of material fact regarding whether agent was authorized fiduciary).[16]

---

[16] In a case involving North Carolina law, the United States Court of Appeals for the Fourth Circuit observed, in dicta, that "it has been held that banks do not owe a duty of care to noncustomers even when the noncustomer is the person in whose name an account was fraudulently opened." Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 226 (4th Cir. 2002). In so noting, the court cited Software Design & Application, Ltd. v. Hoefer & Arnett, Inc., 56 Cal. Rptr. 2d 756 (Cal. App. Aug. 29, 1996), in which the California Court of Appeals "dismissed [the plaintiff's] negligence claim against [a] bank" where "a financial consultant embezzled money from [the plaintiff] through a bank account bearing the company name" because of the "'primary flaw' in [the plaintiff's] negligence theory [of] the lack of a relationship between [the plaintiff] and the bank," Eisenberg, 301 F.3d at 226 (citing Software Design, 56 Cal. Rptr. 2d at 759-63). Of note, and in contrast to this case, the court in Software Design highlighted that the plaintiffs in that action were "not customers or past customers of the banks [and are therefore] strangers to the contractual relationships between [the defendants] and the thieves." Software Design, 56 Cal. Rptr. 2d at 760. On the instant facts, the deposit relationship between La Casa and SCB was
(continued...)

-31-

Quincy also contends that Plaintiffs' negligence claims fail because of Slate's contributory negligence in failing to exercise reasonable diligence with respect to his accounts (see Docket Entry 76 at 15) and because the intervening acts of Rhonda and Charles "supersede[] any passive negligence of Quincy" such that the evidence as to proximate cause falls short (id. at 16; see also Docket Entry 112 at 4-5). Whether Slate's failure to discover the misappropriation amounts to contributory negligence represents a question of fact inappropriate for resolution at this stage. See Stilwell v. General Ry. Servs., Inc., 167 N.C. App. 291, 294, 605 S.E.2d 500, 502 (2004) ("Normally issues such as negligence and contributory negligence are questions for the jury and are seldom appropriate for summary judgment or directed verdict."). Likewise, "[i]t is only in exceptional cases, in which reasonable minds cannot differ as to foreseeability of an injury, that a court should decide proximate cause as a matter of law. Proximate cause is ordinarily a question of fact for the jury . . . ." Williams v.

---

[16](...continued)
established precisely because of the loan commitment relationship between SCB and La Casa thereby making La Casa something other than a stranger to SCB. Moreover, in Eisenberg, the defendant had opened an account as "dba Bear Stearns" when he, in fact, had no connection with that financial institution, Eisenberg, 301 F.3d at 222, and the plaintiff, an individual investor also with no connection with Bear Stearns, brought suit against the bank for negligence in allowing the opening of the account, id. Without deciding the issue, the court observed that "Bear Stearns would be the beneficiary of any duty of care which [the bank] might owe to a noncustomer." Id. at 226. Here, neither Quincy nor SCB has argued that, if Rhonda lacked authority to sign the documents opening the deposit account at issue, La Casa would constitute a noncustomer of SCB. (See Docket Entries 76, 90.)

<u>Carolina Power & Light Co.</u>, 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1979) (internal parentheses omitted).

In sum, Quincy has failed to show entitlement to summary judgment as a matter of law on the negligence claim.

### iii. <u>Fraud/Fraudulent Concealment</u>

Under North Carolina law, fraud requires the following elements: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with the intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." <u>Ragsdale</u>, 286 N.C. at 138, 209 S.E.2d at 500. As an initial matter, Plaintiffs fail to point to an affirmative misrepresentation, either in the Second Amended Complaint or in their briefing on the instant Motion (<u>see</u> Docket Entries 12, 99), that would satisfy the elements of fraud.

Perhaps recognizing this shortcoming, Plaintiffs instead argue that Quincy is liable "for the fraudulent concealment of the embezzlement and unlawful conduct of him, [Rhonda], and Charles." (Docket Entry 99 at 14.) Specifically, Plaintiffs contend that "[d]ue to his awareness [of the alleged misconduct occurring within the SCB account], Quincy had a duty to report this misconduct to Slate, who was the only member-manager of La Casa and the only person in the company who could take appropriate action to stop the malfeasance" (<u>id.</u> at 15) and that Quincy's failure to do so amounts to fraudulent concealment (<u>see id.</u> at 14-16).

"In order to prevail on a fraudulent concealment claim, the [p]laintiff must demonstrate that all or some of the [d]efendants

-33-

had a duty to speak." USA Trouser, S.A. de C.V. v. International Legwear Grp., Inc., No. 1:11-cv-00244-MR-DLH, 2012 WL 6553108, at *11 (W.D.N.C. Dec. 14, 2012) (unpublished) (citing Griffin v. Wheeler Leonard & Co., 290 N.C. 185, 198, 225 S.E.2d 557, 565 (1976)). Moreover, "[t]he concealed information 'must relate to a material matter known to the party and which it is his legal duty to communicate to the other . . . whether the duty arises from a relation of trust, from confidence, inequality of condition or knowledge, or other attendant circumstances.'" Id. (quoting Breeden v. Richmond Cmty. Coll., 171 F.R.D. 189, 194 (M.D.N.C. 1997) (Eliason, M.J.)). However, "a claim for either fraud or fraudulent concealment is not cognizable where the pleader fails to make an independent investigation . . . ." Bryson v. Ocwen Fed. Bank FSB, No. 1:09cv294, 2010 WL 2294325, at *4 (W.D.N.C. Jan. 20, 2010) (unpublished) (citing Calloway v. Wyatt, 246 N.C. 129, 97 S.E.2d 881 (1957)).

Quincy argues that he was not a fiduciary of La Casa and thus had no duty to speak. (See Docket Entry 76 at 9.) However, as noted, such duty may arise not only from a fiduciary relationship, but also from "inequality of condition or knowledge," Breeden, 171 F.R.D. at 194. On these facts, whether Quincy had superior knowledge of the alleged embezzlement and thus a corresponding duty to speak constitutes a factual question rendering resolution of this claim at the summary judgment stage inappropriate. In other words, if Plaintiffs can establish that Quincy knew of Rhonda and

-34-

Charles's alleged malfeasance and remained silent, Quincy may be liable for fraudulent concealment.

Likewise, Slate's asserted failure to "make an independent investigation," Bryson, 2010 WL 2294325, at *4, cannot provide a basis for entry of judgment at this stage. See, e.g., Hudgins v. Wagoner, 204 N.C. App. 480, 491, 694 S.E.2d 436, 445 (2010) ("[The] [d]efendants correctly state that reliance is not reasonable if a plaintiff fails to make any independent investigation. However, the reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." (internal quotation marks and citations omitted)); see also Little v. Stogner, 162 N.C. App. 25, 30, 592 S.E.2d 5, 9 (2004) ("Where . . . a defendant has resorted to an artifice which was reasonably calculated to induce plaintiffs to forego investigation, plaintiffs' failure to conduct an independent investigation is not fatal to a claim for fraud." (internal quotation marks omitted)). The record contains evidence that Slate did not know about the deposit account (see Docket Entry 83-1, ¶ 18) and that Quincy may have known of Slate's possible lack of knowledge (see Docket Entry 100-3 at 2-3).

In sum, Plaintiffs' fraudulent concealment claim against Quincy should proceed to trial.[17]

---

[17] Because Plaintiffs' fraudulent concealment claim should proceed, Plaintiffs' request for punitive damages against Quincy also should proceed. See Terry v. Terry, 302 N.C. 77, 88, 273 S.E.2d 674, 680 (1981) ("In North Carolina actionable fraud . . . is well within North Carolina's policy underlying its concept of
(continued...)

iv. <u>Breach of Fiduciary Duty</u>

Plaintiffs contend, without citation to any record evidence or authority, that:

> Quincy had a fiduciary relationship with his client La Casa. Quincy undertook to provide special services on this account not typically available to SCB's regular customers, such as deferring processing of transactions that would send the account negative, or, in other circumstances, paying transactions that sent the account negative by thousands of dollars and thereby incurring potential liability for the bank; waiving NSF fees; communicating frequently with Charles regarding the account balance and account status; and communicating after hours regarding the account. In addition, Quincy handled almost all of the transactions on this account, and these transactions occurred almost daily for more than two years. Quincy also had a heightened duty based on his solicitation of [P]laintiffs' business and the fact that he was conducting transactions for his uncle. Due to this family relationship, Quincy should have shown extra care to avoid any conflict of interest that could be detrimental to his customer, La Casa.

(Docket Entry 99 at 13.)

Although a fiduciary relationship exists "where confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence," <u>White v. Consolidated Planning, Inc.</u>, 166 N.C. App 283, 293, 603 S.E.2d 147, 155 (2004), under North Carolina law, "[a]n ordinary relationship between a bank and its customers does not, without more, impose upon the bank any special duties to its customers," <u>Global Promotions Grp., Inc. v. Danas Inc.</u>, No. 11 CVS 11756, 2012 WL

_____

[17](...continued)
punitive damages." (internal quotation marks omitted)).

2372630, at *4 (N.C. Super. June 22, 2012) (unpublished) (citing Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 61, 418 S.E.2d 694 (1992)). Plaintiffs cite no authority suggesting that the alleged actions taken by Quincy, or Quincy's familial relationship with Charles, would establish a fiduciary relationship. (See Docket Entry 99). In sum, Plaintiffs' contentions do not suffice to trigger any fiduciary relationship. See South Atl. Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 533 (4th Cir. 2002) ("North Carolina is reluctant to impose 'extra-contractual fiduciary obligations' in the context of general commercial contracts . . . .").

Accordingly, the Court should grant Quincy's Motion for Summary Judgment as to Plaintiffs' breach of fiduciary duty claim.

## v. RICO

"To state a claim under [18 U.S.C.] § 1962(c), [a plaintiff] must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Plaintiff[s] must additionally show that (5) [they were] injured in [their] business or property (6) by reason of the RICO violation.'" Levinson v. Massachusetts Mut. Life Ins. Co., No. 4:06cv086, 2006 WL 3337419, at *6 (E.D. Va. Nov. 9, 2006) (unpublished) (quoting D'Addario v. Geller, 264 F. Supp. 2d 367, 388 (E.D. Va. 2003)). "Congress contemplated that only a party engaging in widespread fraud would be subject to [RICO's] serious consequences." Menasco, Inc. v. Wasserman, 886 F.2d 681, 683 (4th Cir. 1989). "[T]he heightened civil and criminal penalties of RICO are reserved for schemes whose scope and

-37-

persistence set them above the routine." HMK Corp. v. Walsey, 828 F.2d 1071, 1074 (4th Cir. 1987).

Simply put, the circumstances of the instant case "do[] not rise above the routine, and do[] not resemble the sort of extended, widespread, or particularly dangerous pattern of racketeering which Congress intended to combat with federal penalties." Flip Mortg. Corp. v. McElhone, 841 F.2d 531, 538 (4th Cir. 1988). Although Plaintiffs attempt to frame the facts in terms of a host of corporate Defendant entities committing a prolonged, sophisticated embezzlement scheme against a host of corporate Plaintiff entities, in essence, this dispute focuses on the alleged actions of two rogue employees against a single corporate Defendant and its principal. That the purported scheme may have extended over the course of a number of years and involved a substantial amount of money does not place it in the category of cases Congress intended to address through RICO. As the Fourth Circuit noted in McElhone: "[A] great many ordinary business disputes arising out of dishonest business practices or doubtful accounting methods . . . could be described as multiple individual instances of fraud, if one chose to do so. But to adopt such a characterization would transform 'every such dispute . . . [into] a cause of action under RICO.'" Id. (quoting HMK, 828 F.2d at 1074).

In light of this authority, the Court should enter judgment as a matter of law against Plaintiffs on their RICO claim(s) against all Defendants.

### vi. <u>Plaintiffs other than La Casa and Slate</u>

Quincy contends that only La Casa and Slate can maintain a claim against him. (<u>See</u> Docket Entry 76 at 19.)[18] This argument has merit. Quincy did not take any action on an account owned by any of the other corporate Plaintiff entities besides La Casa and, to the extent Quincy owed anyone any duty with respect to any account, he owed a duty only to La Casa. The Court should grant summary judgment for Quincy as to any claim by any Plaintiff other than Slate and La Casa.

### D. SCB's Motion for Summary Judgment

SCB identifies, and moves for summary judgment on, the following claims for relief: (1) "Negligence" (<u>see</u> Docket Entry 90 at 11 (citing "2d Am. Compl., Cnts. VII, IX-X")); (2) "Fraud (or 'Bad Faith')" (<u>see</u> <u>id.</u> at 13); (3) "Breach of Fiduciary Duty" (<u>see</u> <u>id.</u> at 14); and (4) "Respondeat Superior" (<u>see</u> <u>id.</u> at 15). In addition to moving for summary judgment on those claims, SCB seeks summary judgment against all Plaintiffs other than La Casa (<u>see</u> <u>id.</u> at 17), on Plaintiffs' request for lost profits (<u>see</u> <u>id.</u>), as to any request for damages sustained before SCB began doing business with La Casa (<u>see</u> <u>id.</u> at 18), for any damages incurred more than a year before SCB notified Plaintiffs of the account activity based on N.C. Gen. Stat. § 25-4-406 (<u>see</u> <u>id.</u>), regarding losses sustained

---

[18] It is not readily apparent which claims Quincy concedes Slate may maintain against him. Regardless, because Quincy has moved for summary judgment only as to all claims by Plaintiffs other than Slate and La Casa (<u>see</u> Docket Entry 76 at 19), the Court need not determine this issue at this stage.

after Rhonda became a manager in 2006 (see id. at 19), and on Plaintiffs' request for punitive damages (see id. at 20).

### i. Negligence

Plaintiffs' negligence claims against SCB focus on (1) SCB's conduct in opening and/or operating the La Casa deposit account; and (2) supervising and/or retaining Quincy. (See Docket Entry 100 at 8.)[19] As an initial matter, SCB, like Quincy, contends that the UFA protects it from Plaintiffs' negligence claims and/or that Slate's contributory negligence bars those claims. (See Docket Entry 90 at 11-13.) However, for those reasons discussed in Section III.C.ii., a genuine issue of material fact exists with respect to both arguments.

As to the merits of this claim, Plaintiffs' brief contends that SCB negligently opened and/or operated the La Casa account because:

> SCB failed to properly monitor account activity despite frequent overdrafts and NSF's, large deposits drawn out on certified checks the same day, cycling of money between accounts with similar ownership, wide and sudden balance fluctuations, frequent account balance and activity requests by [Charles], use of official checks with [Charles] and [Rhonda] listed as the remitter, and account funds used for obviously personal expenses. ([Docket Entry 100-21] at 9-12; [Docket Entry 100-26] at 57-74.) Not only were these violations of good banking practices, they were also violations of SCB's own policies. ([Docket Entries 100-7, 100-35].) In fact, SCB's security officer testified that these patterns of behavior were "red flags" that should have prompted the bank to investigate. ([Docket Entry 100-28] at 81-89.)

---

[19] Because any claim against SCB based solely on Quincy's actions is more appropriately addressed in Section III.D.iv.'s discussion of respondeat superior, Section III.D.i. addresses other theories of negligence liability for SCB.

-40-

(Docket Entry 100 at 7.)

In support of these contentions, Plaintiffs cite primarily to the Expert Report (Docket Entry 100-21) and deposition (Docket Entry 100-26) of Alton Sizemore, Jr. - a "shareholder and Director of Investigations at Forensic Strategic Solutions, Inc." who "specialize[s] in the area of investigative financial consulting, fraud examination, and litigation consulting with a specialization in the banking industry" (Docket Entry 100-21 at 3). Mr. Sizemore's Expert Report offers his professional opinions that "(1) SCB failed to follow bank policies and good banking practice in the opening of [the] La Casa checking account . . . [;] (2) SCB allowed Quincy [] . . . to serve as the relationship banker for [the La Casa account] in violation of bank policy and good banking practice[;] (3) SCB failed to monitor [the La Casa account] in accordance with bank policy and good banking practice[; and] (4) SCB failed to conduct an appropriate investigation into suspicious activity in [the La Casa account] in November 2007." (Id. at 4.) Mr. Sizemore's deposition testimony further expounds on his opinions of SCB's negligence. (See, e.g., Docket Entry 100-26 at 7-8.) Plaintiffs also cite to SCB's Teller Operations Manual (Docket Entry 100-7) to support their arguments that SCB condoned actions in tension with their own internal policies. (See Docket Entry 100 at 7.)

SCB has come forward with the Report of its own expert - Danny Dukes - which offers Mr. Duke's professional opinions that: (1) "SCB followed reasonable banking industry 'know your customer'

-41-

standards when opening [the] La Casa checking account . . .";  (2) "SCB followed reasonable arm's length banking practices when it allowed Quincy [] to serve as the relationship banker for [the La Casa account]"; (3) "SCB adequately monitored [the La Casa account] in accordance with reasonable banking practices and procedures"; and (4) "SCB timely, properly and appropriately questioned activity in [the La Casa account] in November 2007." (Docket Entry 114-1 at 6.)  This conflicting expert testimony renders the Court unable to declare Plaintiffs' claim insufficient as a matter of law.  <u>See generally</u> <u>Moye v. Thrifty Gas Co., Inc.</u>, 40 N.C. App. 310, 315, 252 S.E.2d 837, 841 (1979) ("In light of the conflicting expert affidavits, it is clear that a genuine issue of fact as to negligence was raised . . . .").  Accordingly, the Court should deny SCB's Motion for Summary Judgment on the negligence claim in so far as it concerns the opening and/or operating of the La Casa account.

However, Plaintiffs have offered insufficient evidence for a claim of negligent supervision and/or retention to proceed to trial.  "Under North Carolina law, an employer may be held liable for the tortious acts of its employees, based on [] a theory of . . . negligent supervision if, '<u>prior to the [tortious] act</u>, the employer knew or had reason to know of the employee's incompetency' even if 'the act of the employee either was not, or may not have been, within the scope of his employment.'"  <u>McFadyen v. Duke Univ.</u>, 786 F. Supp. 2d 887, 1002 (M.D.N.C. 2011) (quoting <u>Hogan v. Forsyth Country Club Co.</u>, 79 N.C. App. 483, 495-96, 340 S.E.2d 116,

-42-

124 (1986)) (emphasis added), <u>rev'd in part on other grounds</u>, ___
F.3d ___ (4th Cir. 2012); <u>see also</u> <u>Foster v. Nash-Rocky Mount Cnty.</u>
<u>Bd. of Educ.</u>, 191 N.C. App. 323, 330, 665 S.E.2d 745, 750 (2008)
("The elements that a plaintiff must prove to show a claim for
negligent hiring, supervision, and retention are: (1) the specific
negligent act on which the action is founded[;] (2) incompetency,
by inherent unfitness of previous specific acts of negligence, from
which incompetency may be inferred; [] (3) either actual notice to
the master of such unfitness or bad habits, or constructive notice,
by showing that the master could have known the facts had he used
ordinary care in oversight and supervision []; and (4) that the
injury complained of resulted from the incompetency proved."
(internal quotation marks omitted)). Plaintiffs offer no evidence
regarding Quincy's actions prior to the events at issue in this
case, much less SCB's knowledge of the same, and thus, a claim for
negligent supervision/retention fails as a matter of law.

## ii. <u>Fraud</u>

Plaintiffs acknowledge that they "do not plead claims of
direct fraud against [SCB]. Rather [P]laintiffs allege that SCB
has respondeat superior liability for the fraudulent concealment by
its employee, Quincy." (Docket Entry 100 at 11.) Accordingly,
this Memorandum Opinion addresses the fraud claim against SCB
solely in Section III.D.iv.

## iii. <u>Breach of Fiduciary Duty</u>

Plaintiffs argue that "SCB breached its own fiduciary duty to
La Casa and Slate." (<u>Id.</u> at 12.) Specifically, Plaintiffs contend

-43-

that "Slate and La Casa reposed special confidence in SCB" in that "SCB provided a loan and line of credit to La Casa, and SCB also exercised control over Slate's personal funds by requiring Slate to deposit them in a UVEST securities investment account." (Id.) According to Plaintiffs, "[f]rom Slate's perspective, the UVEST manager had total control over the investment and management of these funds." (Id. at 12-13.) Moreover, Plaintiffs note that "SCB undertook to investigate irregularities in the La Casa account [and, because] SCB had superior expertise in this regard[], [] La Casa and Slate trusted SCB to exercise its expertise in good faith for their benefit." (Id. at 13.)

As previously noted, North Carolina law generally provides that "[a]n ordinary relationship between a bank and its customers does not, without more, impose upon the bank any special duties to its customers," Global Promotions Grp., 2012 WL 2372630, at *4 (citing Thompson, 107 N.C. App. at 61, 418 S.E.2d at 694)). That SCB "provided a loan and line of credit to La Casa" does not transform the instant relationship into something beyond that typical of a bank and its customer. Moreover, Plaintiffs' contention that "SCB exercised control over Slate's personal funds by requiring Slate to deposit them in a UVEST securities investment account" fails in light of the undisputed record evidence that SCB neither managed the UVEST securities account nor provided investment advice to Slate. (See Docket Entry 90-3 at 6-7.) Finally, Plaintiffs cite no authority that SCB's efforts to investigate potentially fraudulent activity regarding the La Casa

-44-

account would establish a fiduciary relationship. (See Docket Entry 100 at 13.)

In sum, because the evidence before the Court reveals only a typical banking relationship between SCB and La Casa and/or Slate, see Global Promotions Grp., 2012 WL 2372630, at *4, the Court should enter judgment as a matter of law on Plaintiffs' breach of fiduciary duty claim against SCB.

### iv. Respondeat Superior

In addition to direct liability against SCB, Plaintiffs seek to impose liability on SCB for Quincy's actions under principles of respondeat superior. (See Docket Entry 100 at 13-15.) Due to the foregoing conclusions that only the claims for conversion (on a civil conspiracy theory), fraudulent concealment, and negligence should proceed against Quincy, the discussion which follows will not address any other claims in the respondeat superior context. See Case v. Stewart, No. 3:03 CV 388, 2007 WL 37741, at *6 (W.D.N.C. Jan. 4, 2007) (unpublished) ("If there is no underlying tort, no respondeat superior claim can lie against the employer . . . .").

"Generally, employers are liable for torts committed by their employees who are acting within the scope of their employment under the theory of respondeat superior." Matthews v. Food Lion, LLC, 205 N.C. App. 279, 281, 695 S.E.2d 828, 830 (2010). "To be within the scope of employment, an employee, at the time of the incident, must be acting in furtherance of the principal's business and for the purpose of accomplishing the duties of his employment."

-45-

<u>Troxler v. Charter Mandala Ctr.</u>, 89 N.C. App. 268, 271, 365 S.E.2d 665, 668 (1988). "In North Carolina, intentional torts have rarely been considered within the scope of an employee's employment. Nevertheless, rarely does not mean never." <u>White</u>, 166 N.C. App. at 298, 603 S.E.2d at 157 (internal quotation marks and citation omitted). "And in North Carolina, the scope-of-employment question is ordinarily one for the jury." <u>Borneman v. U.S.</u>, 213 F.3d 819, 828 (4th Cir. 2000) (citing <u>Medline v. Bass</u>, 327 N.C. 587, 398 S.E.2d 460, 463 (1990)).

"In determining liability, the critical question is whether the tort was committed in the course of activities that the employee was authorized to perform." <u>White</u>, 166 N.C. App. at 298, 603 S.E.2d at 158. <u>White</u>, in fact, draws a distinction between "cases in which an employee is able to commit a tort solely by virtue of his employment and presence on the employer's premises, and those in which an employee is able to commit a tort by performing the precise tasks that he was hired to do and was held out to the public as authorized to perform." <u>Id.</u> Here, as in <u>White</u>, a reasonable fact-finder could conclude that the alleged acts of negligence, conversion, and fraudulent concealment, if proven against Quincy, were committed "by performing the precise tasks that [Quincy] was hired to do and was held out to the public as authorized to perform," <u>id.</u>, thus rendering Plaintiffs' respondeat superior theories of liability against SCB improper for resolution at summary judgment.

v. <u>Plaintiffs other than La Casa</u>

SCB contends that "[n]o corporate [P]laintiff other than La Casa [] was a customer of [SCB]. Therefore, all other corporate [P]laintiffs' claims against [SCB] should be dismissed. Moreover, although Slate was a customer of [SCB], there is no allegation that any wrongdoing occurred with a [SCB] account belonging to Slate individually." (Docket Entry 90 at 17.) In response, Plaintiffs contend that "SCB is not entitled to summary judgment against [P]laintiffs other than Slate and La Casa [because] SCB bears respondeat superior liability for Quincy's RICO activities, and damage to all [P]laintiffs was foreseeable. Thus, on these claims, SCB is liable to all [P]laintiffs." (Docket Entry 100 at 15.) With respect to the negligence claims, "[P]laintiffs agree that SCB is not liable . . . to any [P]laintiffs but Slate and La Casa, with whom SCB had a banking relationship [but contend that] this does not limit SCB's damages liability on these claims [because] [t]he damages of all [P]laintiffs are intertwined, and Slate suffered personal damages to the entire amount of damage of all [P]laintiffs." (Docket Entry 100 at 15.)

Given the conclusion (discussed in Section III.C.v.) that any RICO claim fails as a matter of law, no reason exists to address Plaintiffs' argument regarding the corporate Plaintiff entities' role in this action. Moreover, the record contains no evidence that SCB acted negligently on accounts owned by Slate or any other Plaintiff entities. Accordingly, any Plaintiffs other than La Casa cannot maintain a claim against SCB.

-47-

###### vi. Damages prior to La Casa becoming a SCB Customer

Plaintiffs acknowledge that SCB is not liable for any losses sustained prior to the date it began doing business with La Casa - July 27, 2005. (See Docket Entry 90-12 at 2; Docket Entry 90 at 18.) The Court thus should grant SCB's Motion for Summary Judgment on this issue.

###### vii. Applicability of N.C. Gen. Stat. § 25-4-406

SCB contends that N.C. Gen. Stat. § 25-4-406 limits any recovery for unauthorized payments. (See Docket Entry 90 at 18-19.) That statute provides in relevant part:

> (c) If a bank sends or makes available a statement of account or items pursuant to subsection (a) of this section, the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

> (d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection (c) of this section, the customer is precluded from asserting against the bank:

> . . . .

>> (2) The customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

-48-

. . . .

(f)  Without regard to care or lack of care or either
the customer or the bank, a customer who does not
within one year after the statement or items are
made available to the customer (subsection (a) of
this section) discover and report the customer's
unauthorized signature on or any alteration on the
item is precluded from asserting against the bank
that unauthorized signature or alteration. . . .

N.C. Gen. Stat. 25-4-406.  Plaintiffs take the position that "the
one year limitation in [Section 406(f)] is only applicable where a
bank pays the items in 'good faith.'"  (Docket Entry 100 at 17.)

Although neither party has identified North Carolina authority
addressing this issue, pertinent case law from other jurisdictions
with similar statutes conflicts with Plaintiffs' position.  See,
e.g., American Fed'n of Teachers, AFL-CIO v. Bullock, 605 F. Supp.
2d 251, 259 (D.D.C. 2009) ("[Section] 4-406(f) does not impose a
prior pre-condition of good faith."); Halifax Corp. v. First Union
Nat'l Bank, 546 S.E.2d 696, 701-03 (Va. 2001) ("[Section 406(f)] is
devoid of any language which limits the customer's duty to discover
and report unauthorized signature and alterations to items paid in
good faith by the bank.  The absence of the phrase, 'good faith,'
in the language chose by the General Assembly compels this [c]ourt
to conclude that a bank's statutory right to assert a customer's
failure to give the statutorily prescribed notice is not predicated
upon whether the bank exercised good faith in paying the item which
contained the unauthorized signature or alteration.").  In light of
the foregoing authority, and given that subsection (f) omits the
good faith language of subsection (d)(2), and given subsection

-49-

(f)'s specific applicability "[w]ithout regard to care or lack of care," N.C. Gen. Stat. 25-4-406(f), Plaintiffs' position cannot prevail.

Plaintiffs also contend that Section 406(f) is inapplicable "because SCB did not 'send or make available' <u>to Slate</u> any statements from the La Casa account, which is necessary to trigger the one year limitation period. Since Slate was unaware of the account's existence, he could not have known to look for the statements." (Docket Entry 100 at 18 (emphasis added).) However, the record evidence before the Court reveals that SCB sent statements on the La Casa account to the corporate address of La Casa. (<u>See</u> Docket Entry 85-1.) Slate was not SCB's customer with respect to the La Casa deposit account. Because SCB's actions satisfy the requirements of the statute, Plaintiffs may not recover for damages resulting from unauthorized payments occurring more than one year prior to SCB making available statements disclosing the unauthorized account activity.[20]

### viii. <u>Lost Profits</u>

"In order to recover damages for lost profits, the complainant must prove that except for the [wrongful act], profits would have been realized, and he must ascertain such losses with 'reasonable certainty.'" <u>Iron Steamer, Ltd. v. Trinity Rest., Inc.</u>, 110 N.C.

---

[20] This argument applies equally to potential damages against Quincy for negligence regarding the SCB accounts. However, Plaintiffs' claims against Quincy for conspiracy to commit conversion and fraudulent concealment would not appear to fall subject to the application of N.C. Gen. Stat. § 25-4-406(f).

App. 843, 847, 431 S.E.2d 767, 770 (1993) (quoting Olivetti Corp. v. Ames Bus. Sys., Inc., 319 N.C. 534, 546, 356 S.E.2d 578, 585 (1987)). "North Carolina courts have long held that damages for lost profits will not be awarded based upon hypothetical or speculative forecasts of losses." Id. "While the amount of damages is ordinarily a question of fact, the proper standard with which to measure those damages is a question of law." Id. at 848, 431 S.E.2d at 771.

SCB contends that "Plaintiffs' lost-profits claim is unsupported by expert opinion, relates to new companies that never completed a project; is based on 'involvement' of persons (Slate and Shriver) who deny any involvement with the lost-profit calculation and another person [] who Slate is suing for fraud; relate to speculative real estate ventures, in an increasingly soft market, that were headed by a man with not a whole lot of developmental experience, and are apparently based on pro formas describing expected profit." (Docket Entry 90 at 18 (internal quotation marks omitted).) Plaintiffs respond that they have provided sufficient evidence in that "Plaintiffs' chief evidence of lost profits are pro formas prepared by (now former) employees of La Casa . . . [which] set forth exacting detail regarding expenses and costs, estimated lot prices, estimated sales, estimated interest payments, estimated taxes, and more [that are] further

-51-

supported by the testimony of Slate and Baird." (Docket Entry 100 at 16-17.)[21]

Plaintiffs' evidence of lost profits does not suffice. Plaintiffs cite to the Baird affidavit which states that "the pro formas [were] prepared by La Casa employees, including Eddie Pate and Susan Kirkland" (Docket Entry 106, ¶ 6); however, as SCB notes, neither Pate nor Kirkland has provided testimony in this matter (Docket Entry 114 at 6). Moreover, the Slate deposition identifies Pate as someone hired "to start a home building company" (see Docket Entry 90-6 at 8) and Kirkland as "an executive assistant" (see id.), descriptions which do not make clear what, if any, qualifications either had to create the pro formas, much less what methodology they used. In addition, despite the assertion that the pro formas are "supported by the testimony of Slate and Baird" (Docket Entry 100 at 16), the cited portions of those depositions offer insufficient justification for the figures set forth in the pro formas. Baird merely offers that, as a result of Rhonda and Charles's actions, "[P]laintiff companies suffered lost profits of $14 million or more" and refers back to the pro formas, without any information that would provide any "reasonable certainty" as to those figures. (Docket Entry 106, ¶ 6.) The Slate affidavit only

---

[21] "Pro formas are predictions of future performance." <u>Kiddie Acad. Domestic Franchising LLC v. Faith Enters. DC, LLC</u>, Civil No. WDQ-07-705, 2009 WL 2169060, at *1 n.3 (D. Md. July 17, 2009) (unpublished); <u>see also</u> <u>Black's Law Dictionary</u> 1212 (6th ed. 1990) (defining "pro forma," in relevant part, as "[u]sed to describe accounting, financial, and other statements or conclusions based upon assumed and anticipated facts").

references a basis for Slate's position that lost profits resulted, but again lacks information to support the "reasonable certainty" of those amounts. (See Docket Entry 83-1, ¶ 34.) Finally, both Slate and Slate's accountants deny any role in the actual development of the lost profit amounts. (See Docket Entry 90-6 at 35; Docket Entry 90-5 at 4.)

Under these circumstances, the Court should enter summary judgment for SCB as to lost profits. See Team Gordon, Inc. v. Fruit of the Loom, Inc., No. 3:06CV201-RJC-DCK, 2010 WL 419952, at *2-3 (W.D.N.C. Jan. 29, 2010) (unpublished) (quoting Iron Steamer, 110 N.C. App. at 847, 431 S.E.2d at 770, for proposition that "[d]amages for lost profits cannot be based upon 'hypothetical or speculative forecasts of losses'" and excluding consideration of lost profits at trial where the plaintiff relied on "'Pro Forma Profit & Loss' statement," because "lost profits are too speculative and not reasonably certain," given that "[t]here is no historical financial performance with which the Court can compare the estimate [of lost profits in the 'Pro Forma,'] . . . there is no evidence of [the] credentials [of the persons who prepared the 'Pro Forma'] in making financial projections . . [and the 'Pro Forma'] was purportedly prepared by [persons] of whom the Court knows nothing"); Southeast Coastal Dev. Fund, LLC v. Cruse, No. 5:08CV45F, 2010 WL 147910, at *3-4 (E.D.N.C. Jan. 13, 2010) (unpublished) (quoting Iron Steamer, 110 N.C. App. at 847, 431 S.E.2d at 770, for proposition that "North Carolina courts have refused to award damages for lost profits 'based upon hypothetical

or speculative forecasts of losses'" and holding that the plaintiff "relies upon pure speculation in forecasting its lost profits," where its expert relied on figures in a "'pro forma financial statement forecasting pre-tax income and net cumulative cash flows for five years,'" because although the expert "may be satisfied with [the] explanations for the various amounts in the pro forma financial statement; the court, however has not been given the benefit of _any_ explanation for the figures contained in the statement . . [and] there is no evidence before this court referencing any sort of market research or analysis or comparisons to similar developments" (emphasis in original)); see also Burdick v. Teal, No. 1:02CV727, 2003 WL 1937118, at *2 (M.D.N.C. Apr. 22, 2003) (unpublished) (Osteen, Sr., J.) ("The court also notes the vast gulf which exists between the often wildly optimistic and speculative projections contained in pro formas, which sometimes are little more than marketing documents, and the proof necessary to recovery at law." (internal footnote omitted)).

   ix. Liability for Damages after La Casa made Rhonda a Manager

        SCB argues that, "[i]f it is not clear that the [SCB] checking accounts were authorized from the start, they were, as a matter of law, authorized by early 2006." (Docket Entry 90 at 19.) Specifically, SCB points to the La Casa Operating Agreement Amendment making Rhonda a manager of La Casa thus giving Rhonda, in SCB's view, "the power to open La Casa bank accounts on her own authority (or to ratify previously unauthorized accounts) and to use LLC funds at her discretion." (Id.) SCB further argues:

-54-

"Moreover, as of March 30, 2006, Rhonda had a *general power* of attorney allowing her to engage in banking transactions in Slate's stead." (Id. (italics in original).) Plaintiffs contend that "the January 16, 2006 amendment to the operating agreement was not authorized or signed by Slate. Though SCB argues to the contrary, SCB's argument is factual, not legal." (Docket Entry 100 at 19.) With respect to the power of attorney, Plaintiffs contend that "this power of attorney is *not* an unlimited general power of attorney, as implied by SCB. Instead, as set forth in the italicized language in the document, the power of attorney provided a limited grant of authority for [Rhonda] to sign the documents for a property closing that occurred on March 30, 2006." (Id. at 19-20.)

On the record evidence before it, the Court cannot conclude, as a matter of law, that Rhonda had authority to act on behalf La Casa. A genuine issue of material fact exists as to the authenticity and, therefore, the effectiveness of the January 2006 operating agreement amendment, which Slate contends was forged. SCB, in addition, does not offer evidence that it relied on that amendment. Moreover, the power of attorney is unclear, not only in light of the italicized language specifying the powers granted, but also because it appears Slate executed it in his personal capacity[22] and because the power of attorney only mentions Rhonda's power to

_____

[22] Indeed, Plaintiffs appear to acknowledge that the power of attorney came into existence to permit Rhonda "to sign an *individual guaranty* for Slate." (Docket Entry 114 at 9 n.15 (italics in original).)

act on behalf of Slate with respect to "the purchase of real estate
. . . known as The Commons at Archdale" (Docket Entry 114-1 at 37).
See SunTrust Bank v. C & D Custom Homes, LLC, ___ N.C. App. ___,
___, 734 S.E.2d 588, 589 (2012) ("A power of attorney must be
strictly construed and will be held to grant only those enumerated
powers." (internal quotation marks omitted)).  On these facts, the
Court should decline to enter summary judgment for SCB on the basis
of any authority Rhonda may have gained by way of the operating
agreement amendment or power of attorney in 2006.

x. <u>Punitive Damages</u>

     North Carolina law permits the awarding of punitive damages
"in the case of a corporation [if] the officers, directors or
managers participated in or condoned the conduct constituting the
aggravating factor giving rise to punitive damages" and further
provides that "[p]unitive damages shall not be awarded against a
person solely on the basis of vicarious liability."  N.C. Gen.
Stat. 1D-15(c).  SCB contends that "Plaintiffs do not even plead
such an allegation, and no evidence suggests that [SCB] management
participated in or condoned any wrongdoing."  (Docket Entry 90 at
20.)  Plaintiffs do not address this argument in their Response.
(See Docket Entry 100.)

     SCB's argument has merit.  The record evidence shows that SCB
took steps to investigate the NSF issues on the La Casa account
(see Docket Entry 100-5) and closed the account once concerns
reached a certain threshold (see Docket Entry 100-3). Because the
record lacks evidence that SCB's officers, directors and/or

-56-

managers acted with or condoned fraud, malice, or willful or wanton conduct, the Court should enter summary judgment for SCB as to any request for punitive damages.

### E. Plaintiffs' Motion for Summary Judgment

#### i. Plaintiffs' Claims against Rhonda, Charles and the corporate Defendant entities

Plaintiffs "move the [C]ourt for summary judgment on all claims by [P]laintiffs against Rhonda []; Charles []; B23 Holdings, LLC; Ascott Kelly Group of NC, Inc.; Ascott Kelly Hospitality Group, Inc.; AK Holdings I, LLC; A K Holdings II, LLC; A K Holdings SC I, LLC; Windsor Holdings I, LLC; Ellison & Howell Properties, Inc.; and QuintonEli Development, Inc." (Docket Entry 83 at 2.) Specifically, Plaintiffs seek summary judgment on their claims for: (1) conversion against Rhonda and Charles (see id. at 6-7); (2) breach of fiduciary duty against Rhonda (see id. at 7-8); (3) fraud against Rhonda and Charles (see id. at 8-9); (4) fraudulent concealment against Rhonda and Charles (see id. at 9-12); (5) RICO against Rhonda and Charles (see id. at 12-15); (6) fraudulent transfer against Rhonda, Charles, and the corporate Defendant entities (see id. at 15-17); and (7) civil conspiracy against Rhonda and Charles (see id. at 17-19).

#### a. Evidentiary Support

Plaintiffs have cited record evidence sufficient to support each of the foregoing claims with the exception of the fraudulent transfer and RICO claims. As to the various items of conversion, Slate attests that, "[s]oon after the start of her employment,

-57-

[Rhonda] embezzled small, and then much larger excess payroll amounts from [Slate Marketing] and other [P]laintiff companies" (Docket Entry 83-1, ¶ 7); that Rhonda "refinanced [Slate's] mortgage for $127,653.13 more than the amount owed on the outstanding note [and] then diverted the . . . excess loan proceeds to her own use" (id., ¶ 8); that Rhonda and Charles "drew $125,000 off of an existing home loan equity line of credit . . . without [Slate's] authorization" (id., ¶ 9); and that Slate "agreed to loan [Charles] money from [Slate's] personal funds [for the purchase of the High Meadows home, but] the money for the loan was taken . . . from the La Casa line of credit at SCB . . . [and Rhonda] cancelled the note payable to La Casa" without permission or authority before its repayment (id., ¶¶ 27-30). Regarding the Jewelry Conversion, Slate avers that "he maintained a safe deposit box . . . that held jewelry"; that Rhonda, "as a trusted employee, [] had access to this safe deposit box"; and that "bank records reveal no one else had accessed the safe deposit box during the relevant time period" when the jewelry went missing. (Docket Entry 83-1, ¶ 26). Plaintiffs have also attached the Record of Vault Entries to support that final assertion. (See Docket Entry 113-3 at 1-2.)

With respect to the fraud and fraudulent concealment claims, Plaintiffs offer Slate's testimony that Rhonda and Charles "understated the amount of [P]laintiff companies' liabilities and did not disclose the existence of certain loans made to [P]laintiff companies notwithstanding [Slate's] repeated inquiries" (Docket Entry 83-1, ¶ 24); that "[w]hen [Slate] would ask to see loan or

-58-

balance information [Rhonda] would simply transfer money from one or more unknown accounts to the inquired upon loan or account in order to conceal her embezzlement" (id.); and that Rhonda and Charles "concealed from [Slate] their personal expenditures made from [P]laintiff companies' accounts, concealed the full amount of [P]laintiffs' outstanding debt, and concealed the existence of credit cards used for personal expenditures of [Rhonda] and [Charles]" (id., ¶ 25).

Furthermore, as it relates to Rhonda's role in these actions, Plaintiffs contend that they "reposed great trust and confidence in [Rhonda]" including "charg[ing] [Rhonda] with overseeing all of [P]laintiff companies' finances"; "task[ing] [Rhonda] with negotiating loans for [P]laintiff companies, managing their bank accounts, and making payments on business related expenses"; and "consult[ing] [Rhonda] when Slate wished to pay off his home mortgage." (Docket Entry 83 at 7-8.) Slate's affidavit supports those assertions (see Docket Entry 83-1, ¶¶ 3, 5, 6, 8), thereby establishing Rhonda's fiduciary relationship with Plaintiffs. See White, 166 N.C. App. at 293, 603 S.E.2d at 155 ("'In general terms, a fiduciary relation is said to exist '[w]herever confidence in one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence.'" (quoting Vail v. Vail, 233 N.C. 109, 114, 63 S.E.2d 202, 206 (1951))).

Slate's affidavit (Docket Entry 83-1), along with the Expert Report of Kelly Todd (see Docket Entry 83-2) and the evidentiary record as a whole (see, e.g., Docket Entries 100-8, 100-10), would permit a finding that Charles and Rhonda acted as co-conspirators, such that they would have joint and several liability for their acts of conversion, fraud, and fraudulent concealment on the SCB Conversion, the High Meadows Conversion, and the Refinancing Conversion (but not with respect to the Jewelry Conversion as to which there is no evidence that Charles participated in, benefitted from, or knew of that act or the Payroll Conversion as to which the Court is unable to determine from the record evidence at this stage whether the funds used by Charles resulted from that alleged act or whether Charles knew of those actions). See Muse v. Morrison, 234 N.C. 195, 198, 66 S.E.2d 783, 785 (1951) ("The liability of the conspirators is joint and several. That [e]very one who does enter into a common purpose or design is equally deemed in law a party to every act which had been done by the others, and a party to every act which may afterwards be done by any of the others in furtherance of such common design . . . ." (internal quotation marks omitted).)

Finally, the Expert Report of Kelly Todd provides evidentiary support that damages resulted with respect to each of (1) the alleged Payroll Conversion from 1999 to 2008;[23] (2) general

---

[23] Slate's affidavit states: "Although the Todd Report only quantifies [Rhonda]'s payroll embezzlement dating back to 1999, as stated in the [Second] [A]mended [C]omplaint[,] [Rhonda] began her
(continued...)

unauthorized transactions conducted by Charles and Rhonda; (3) the High Meadows Conversion; and (4) the Refinancing Conversion. (See Docket Entry 83-2 at 4-16.) Similarly, Slate avers as to the estimated value of the jewelry. (See Docket Entry 83-1, ¶ 26.) Although Plaintiffs' evidence may not enable the Court to enter judgment as a matter of law as to the damages amount at this stage, the unrebutted evidence sufficiently establishes that damages resulted from Rhonda and Charles's actions. See Graham v. National Union Ins. Co. of Pittsburgh, PA, No. 1:10-00453, 2013 WL 870298, at *2 (S.D.W. Va. Mar. 7, 2013) (unpublished) ("Granting summary judgment, in full or in part, may still be appropriate when only damages remain disputed."); see also Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp., 702 F. Supp. 1229, 1230-31 (E.D.N.C. 1988) (quoting previous version of Rule 56 for proposition that summary judgment "may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages").

---

[23](...continued)
payroll embezzlement in 1991. The amount of payroll embezzlement shown in the [C]omplaint for the years 1991-98 is accurate and is based on a review of payments received by [Rhonda] classified as payroll in company accounts that were in excess of her salary as set by me." (Docket Entry 83-1 at 4-5.) Because Plaintiffs' Second Amended Complaint is verified (see Docket Entry 12 at 27-30), it constitutes an affidavit for the purposes of summary judgment, see Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge."); Henley v. Novant Health, Inc., No. 1:12-CV-62, 2013 WL 424695, at *1 (M.D.N.C. Feb. 4, 2013) (Eagles, J.) (unpublished) (citing same).

The record, however, does not establish the transfer of assets to the corporate Defendants so as to warrant judgment as a matter of law on the fraudulent transfer claim. Plaintiffs argue:

> In the present case, [Rhonda] and [Charles]'s transfers to [D]efendants B23 Holdings, LLC; Ascott Kelly Group of NC, Inc.; Ascott Kelly Hospitality Group, Inc.; AK Holdings I, LLC; A K Holdings II, LLC; A K Holdings SC I, LLC; Windsor Holdings I, LLC; Ellison & Howell Properties, Inc; and QuintonEli Development, Inc. were all fraudulent. First, the transfers to the corporate [D]efendants were made with the intent to hinder, delay, or defraud [P]laintiffs. [Rhonda] and [Charles] established these corporations at or around the time they became aware that their embezzlement scheme would be exposed, and [Rhonda] and [Charles] thus expected to be sued for their actions. ([Docket Entry 83-3 at 7].) [Rhonda] and [Charles] retained control over the assets transferred via their control and ownership of the corporate [D]efendants, and there is no evidence that the corporate [D]efendants provided any consideration for the transfer of assets. ([Id. at 9, 12].) Corporate [D]efendants have never made any money of their own, and the total assets of these corporations are less than the amount owed to [P]laintiffs. ([Id. at 5, 11-16].) In addition, [Rhonda] and [Charles] were insolvent at the time of the transfers pursuant to the statute, as the value of [P]laintiffs' legal claims exceeded [D]efendants' assets. See N.C. Gen. Stat. §§ 39-23.1-2. For these reasons, [P]laintiffs are entitled to recover all property owned by these [D]efendants in satisfaction of the judgment against [Rhonda] and [Charles].

(Docket Entry 83 at 15-17.)

In those portions of Rhonda's deposition cited by Plaintiffs, Rhonda invokes her Fifth Amendment privilege in response to questions regarding the corporate Defendant entities' finances. (See Docket Entry 83-3.) Although "a fact-finder is entitled to draw adverse inferences from a defendant's invocation of the privilege against self-incrimination," Eplus Tech. Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002) (emphasis added), persuasive

-62-

authority indicates that "the summary judgment standard, requiring a [c]ourt to draw all reasonable inferences in favor of the nonmoving party, precludes the drawing of an adverse inference, despite the potential for the ultimate trier of fact to [do so]," In re Inflight Newspapers, Inc., 423 B.R. 6, 17 (Bankr. E.D.N.Y. 2010); see also F.T.C. v. Ross, Civil Action No. RDB-08-3233, 2012 WL 2126533, at *6 (D. Md. June 11, 2012) (unpublished) (citing same). Regardless, even if the Court drew an adverse inference from Rhonda's invocation of her privilege, that adverse inference, standing alone, cannot satisfy Plaintiffs' burden at summary judgment without some evidence that a transfer actually occurred. See In re Inflight Newspapers, 423 B.R. at 18.

Here, Plaintiffs' brief does not cite any evidence of transfers to or from the entities purportedly involved in the fraudulent transfer (see Docket Entry 83 at 15-17) and Plaintiffs' Reply is silent on the matter (see Docket Entry 113). Slate's affidavit attached to the instant summary judgment motion does not make mention of knowledge of transfers to any of the corporate Defendant entities (see Docket Entry 83-1) and the attached Expert Report of Kelly Todd likewise fails to address the issue (see Docket Entry 83-4; see also Docket Entry 114-1 at 49-112; Docket Entry 114-2 at 1-129). Accordingly, the Court should decline to enter judgment as a matter of law in favor of Plaintiffs on their fraudulent transfer claim.[24]

---

[24] The Second Amended Complaint does address specific amounts
(continued...)

Despite their refusal to give deposition testimony on matters material to this case, Rhonda and Charles offer the following arguments in opposition to the entry of summary judgment against them on Plaintiffs' claims: (1) "the civil and criminal prosecutions are a vendetta of an angry man who blames [Rhonda and Charles] for his own misguided foray into real estate development at the end of the real estate boom and the beginning of a global financial meltdown" (Docket Entry 96 at 12); (2) "Slate allowed others to personally use company credit cards, have cars, boats, motorcycles, fund an employee's son's professional golf career, and pay salaries over $160,000 (not including bonuses)" and thus, a jury could reject the assertions that Rhonda and Charles's expenditures were not approved (<u>id.</u> at 12-13); (3) the statute of limitations and repose bars some of Plaintiffs' claims (<u>id.</u> at 13)[25]; (4) ratification and waiver defenses apply (<u>id.</u> at 15); (5)

---

[24](...continued)
transferred to Byrd Services, Inc. (<u>see</u> Docket Entry 12, ¶¶ 60-61), but this entity does not appear to be included in Plaintiffs' instant summary judgment motion (<u>see</u> Docket Entry 83 at 6).

[25] As Plaintiffs note (<u>see</u> Docket Entry 113 at 5 n.4), Charles did not raise the statute of limitations or repose as an affirmative defense in his Answer.  In fact, although Charles answered Plaintiffs' Amended Complaint (Docket Entry 8), it does not appear that Charles filed an Answer to Plaintiffs' Second Amended Complaint (<u>see</u> Docket Entries dated Nov. 5, 2009, to present).  The statute of limitations represents an affirmative defense that is waived unless raised.  <u>See</u> Fed. R. Civ. P. 8(c)(1). Accordingly, the Court should consider the statute of limitations issue solely with respect to Plaintiffs' claims against Rhonda. <u>See</u> <u>McLaughlin v. McGee Bros. Co., Inc.</u>, 681 F. Supp. 1117, 1136 (W.D.N.C. 1988) ("[The] [d]efendants have failed to plead the
(continued...)

Rhonda had authority to make financial decisions (id. at 16-17); and (6) Plaintiffs' damages are speculative (id. at 15-16).

With the exception of Rhonda's statute of limitations/repose arguments, these contentions fail to provide any basis for the Court to decline entry of summary judgment in favor of Plaintiffs as to liability on claims against Rhonda for breach of fiduciary duty and both Rhonda and Charles for conversion, fraud and fraudulent concealment. For example, whether the instant action represents "a vendetta of an angry man" (Docket Entry 96 at 2) or whether Rhonda, as a general matter, had authority to make financial decisions is of no moment if Rhonda and Charles misappropriated Plaintiffs' funds and subsequently concealed those actions with respect to the specific transactions at issue. Similarly, the contention that a jury could conclude that, because Slate allowed others to make personal expenditures, he authorized or ratified Rhonda and Charles's expenditures amounts to mere speculation in the face of Plaintiffs' evidence.

Rhonda and Charles's contentions regarding damages also fail to provide a basis for the court to decline to enter summary judgment as to their liability. Rhonda and Charles contend that the Court should not enter judgment as a matter of law in favor of

---

[25](...continued)
statute of limitations as an affirmative defense as required and . . . have thus waived the defense."). However, to the extent Plaintiffs seek to hold Charles liable on a civil conspiracy basis for actions in which he did not participate directly, the applicability of the statute of limitations on Rhonda's claims may affect Charles's liability as well.

Plaintiffs because "Plaintiffs are attempting to attribute almost every dollar it cannot understand . . . to a theft by [Rhonda] and [Charles]." (Docket Entry 96 at 15.) However, Plaintiffs have not requested summary judgment as to damages. (See Docket Entry 113 at 9.) Rather, Plaintiffs respond that, "[u]ltimately, none of [D]efendants' arguments concerning damages prevent summary judgment against them for liability [and that] Plaintiffs are entitled to summary judgment against [D]efendants for liability." (Id. (emphasis added).) As noted, "[g]ranting summary judgment, in full or in part, may still be appropriate when only damages remain disputed." Graham, 2013 WL 870298, at *2. Accordingly, Rhonda and Charles's argument does not provide a basis for the Court to withhold entry of judgment as a matter of law in favor of Plaintiffs on the issue of liability.

Rhonda's statute of limitations defenses, however, do warrant further discussion. Plaintiffs' conversion, fraud, fraudulent concealment, and breach of fiduciary duty claims fall subject to a three-year statute of limitations. See N.C. Gen. Stat. § 1-52(4), (5), (9) (imposing limitations period of three years "[f]or taking, detaining, converting, or injuring any goods or chattels," "[f]or any other injury to the person or rights of another, not arising on contract and not hereafter enumerated," and "[f]or relief on the ground of fraud," respectively); see also Eubank v. Van-Riel, No. COA11-1088, 727 S.E.2d 25 (table), 2012 WL 2308310, at *4 (N.C. App. June, 19, 2012) (unpublished) (discussing applicable statute of limitation for conversion and breach of fiduciary duty,

-66-

including civil conspiracy theory, and citing cases).[26]  Given that Plaintiffs filed this action on December 29, 2008 (see Docket Entry 1-2 at 30), any alleged acts occurring prior to December 29, 2005, would appear potentially subject to a time-bar.  Moreover, the record indicates that Rhonda and Charles committed at least a portion of the acts at issue outside that three-year window: Rhonda purportedly committed the Payroll Conversion over a 17-year period from 1991-2008 (see Docket Entry 12, ¶ 9); per the Second Amended Complaint, Rhonda and Charles persuaded Slate to loan them the money used in the purchase of the High Meadows home in August 2005 (see id., ¶ 19);  Rhonda allegedly opened the La Casa deposit

---

[26]  Rhonda and Charles cite N.C. Gen. Stat. § 1-52(16) for its statement that "no cause of action shall accrue more than 10 years from the last act or omission of the defendant giving rise to the cause of action."  Because N.C. Gen. Stat. § 1-52(16) specifically addresses claims "for personal injury or physical damages to claimant's property," N.C. Gen. Stat. § 1-52(16), it does not apply to the instant facts.  See Birtha v. Stonemore, North Carolina, LLC, ___ N.C. App. ___, ___, 727 S.E.2d 1, 7 (2012) ("[The] [p]laintiffs do not allege bodily harm or physical damage to [the] [p]laintiffs' property; therefore, the discovery rule [in N.C. Gen. Stat. § 1-52(16)] is not applicable."); North Carolina State Bar v. Gilbert, No. COA04-1013, 2006 WL 539367, at *4-5 (N.C. App. Mar. 7, 2006) (unpublished) (noting claims for conversion and fraud not subject to N.C. Gen. Stat. § 1-52(16)).  Moreover, "[b]reach of fiduciary duty exists either as an independent cause of action or as a foundation for constructive fraud."  Gerringer v. Pfaff, No. COA12-785, 2013 WL 601106, at *3 (N.C. App. Feb. 19, 2013) (unpublished) (citing Toomer v. Branch Banking & Tr. Co., 171 N.C. App. 58, 66-67, 614 S.E.2d 328, 335 (2005)).  "'[A] claim of constructive fraud based upon a breach of fiduciary duty falls under the ten-year statute of limitations contained in N.C. Gen. Stat. § 1-56 . . . .'"  Toomer, 171 N.C. App. at 67, 614 S.E.2d at 335 (quoting NationsBank of N.C. v. Parker, 140 N.C. App. 106, 113, 535 S.E.2d 597, 602 (2000)).  Plaintiffs have not argued that Rhonda's alleged breach of fiduciary duty amounts to constructive fraud or that the ten-year statute of limitations of Section 1-56 applies to this claim.  (See Docket Entries 83, 113.)

account central to the SCB Conversion in August 2005 (see id., ¶ 24); and the Refinancing Conversion concerns events that occurred in April 2004 (see id. ¶ 68). Only the Jewelry Conversion, which the Second Amended Complaint alleges occurred "on either January 11 or 23, 2008" (id., ¶ 45.) falls entirely within three years of the filing of this action.

However, the Court cannot apply the statute of limitations on the instant facts at this stage for at least three reasons. First, many of these events, such as the SCB Conversion, include a number of alleged acts occurring over a number of years, and the record does not make clear the specific date as to each. Second, "[f]or the recovery on the ground of fraud . . .[,] the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud," N.C. Gen. Stat. 1-52(9), and "[t]he date of [the plaintiff's] discovery of the alleged fraud or negligence-or whether she should have discovered it earlier through reasonable diligence-is a question of fact for a jury," Piles v. Allstate Ins. Co., 187 N.C. App. 399, 405, 653 S.E.2d 181, 186 (2007). Third, "North Carolina courts have recognized and applied the principle that a defendant . . . may be equitably estopped from using a statute of limitations as a sword, so as to unjustly benefit from his own conduct which induced a plaintiff to delay filing suit," White, 166 N.C. App. at 305, 603 S.E.2d at 162, and the "[North Carolina] Supreme Court has recognized the continuing wrong doctrine as an exception to the general rule that a claim accrues when the right to maintain suit

-68-

arises. 'When this doctrine applies, a statute of limitations does not begin to run until the violative act ceases.'" <u>Babb v. Graham</u>, 190 N.C. App. 463, 481, 660 S.E.2d 626, 637 (2008) (citing and quoting <u>Williams v. BlueCross Blue Shield of N.C.</u>, 357 N.C. 170, 178-79, 581 S.E.2d 415, 423 (2003) (internal citation omitted).

Accordingly, although the Court arguably could enter summary judgment as to liability for actions occurring after December 29, 2005, against Rhonda, it would appear more prudent to proceed to trial for determinations of: (1) when Rhonda's alleged acts of breach of fiduciary duty, fraud, fraudulent concealment and conversion occurred; and (2) for any acts outside the statutory window, whether equitable estoppel precludes Rhonda from asserting the statute of limitations as to those claims and/or whether the discovery rule of N.C. Gen. Stat. § 1-52(9) renders earlier acts timely.

## ii. <u>Rhonda and Charles's Counterclaim</u>

Plaintiffs also move "for summary judgment in [Slate's] favor on Rhonda [] and Charles['s] counterclaims alleging infliction of emotional distress." (Docket Entry 81, ¶ 8.) Under North Carolina law, intentional infliction of emotional distress requires proof of: 1) extreme and outrageous conduct; 2) which was intended to cause and did cause; 3) severe emotional distress to another. <u>Chapman v. Byrd</u>, 12 N.C. App. 13, 19, 475 S.E.2d 734, 739 (1996). "In this context, the term 'severe emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe

-69-

and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990).

The entirety of Rhonda and Charles's briefing on this matter states:

> [Joseph] confirms Mr. Woychik's statement that Mr. Slate was making [Rhonda] (and [Charles]) fearful. Mr. Slate acknowledged to [Joseph] that he was causing [Rhonda] physical problems.

(Docket Entry 96 at 17.)

Rhonda and Charles fail to cite to any record evidence supporting this assertion, and neither the portions of the Slate Affidavits (Docket Entry 96-1, 96-2) nor Joseph's affidavit (Docket Entry 96-5) attached to their brief address this matter. The record before the Court provides no basis to conclude that either Rhonda or Charles suffered the kind of severe emotional distress necessary to a claim for intentional infliction of emotional distress. Accordingly, the Court should enter summary judgment for Slate on that counterclaim.

## IV. CONCLUSION

Because Rhonda and Charles attempt to offer exculpatory evidence at a late stage in these proceedings after previously pleading the Fifth Amendment, the Court should not consider their affidavits for purposes of deciding the instant summary judgment motions, but the Court should decline to strike SCB's Summary Judgment Motion entirely. With respect to the Defendants' motions

-70-

for summary judgment, Plaintiffs have provided sufficient evidence to survive summary judgment with respect to some of their claims against John, Quincy, and SCB, but not as to others. As to Plaintiffs' motion for summary judgment, Plaintiffs have carried their burden for the Court to enter judgment as a matter of law as to liability against Charles for conversion, fraud and fraudulent concealment, in addition to liability as a co-conspirator of Rhonda on those same claims, but Plaintiffs' claims against Rhonda for conversion, fraud, fraudulent concealment and breach of fiduciary duty should proceed to trial for resolution of applicable statutes of limitations issues. Plaintiffs have also failed to establish entitlement to judgment as a matter of law in their favor on their fraudulent transfer claim. Finally, Plaintiffs' RICO claim(s) as to all Defendants are insufficient as a matter of law.

**IT IS THEREFORE RECOMMENDED** that Plaintiffs' Motion to Strike and for Sanctions (Docket Entry 94) be granted in part and denied in part in that, treating said Motion as objections under Fed. R. Civ. P. 56(c)(2), the Court should decline to consider the affidavits of Rhonda Byrd (Docket Entry 77) and Charles Washington (Docket Entry 88) in deciding the instant summary judgment motions, but should not strike SCB's Motion for Summary Judgment (Docket Entry 72).

**IT IS FURTHER RECOMMENDED** that Defendant John Washington [sic] Motion for Summary Judgment (Docket Entry 70) be granted in part and denied in part in that the Court should enter judgment as a matter of law against Plaintiffs on the fraud and RICO claim(s)

-71-

asserted against John, but the Court should refrain from taking action on any other asserted bases of liability not specifically addressed by John in briefing.

**IT IS FURTHER RECOMMENDED** that Defendant Quincy Washington's Motion for Summary Judgment (Docket Entry 74) be granted in part and denied in part in that the Court should enter judgment as a matter of law against Plaintiffs on their breach of fiduciary duty and fraud claims against Quincy and RICO claim(s) against all Defendants, as well as all claims by Plaintiffs other than La Casa and Slate against Quincy, and should limit negligence damages based on N.C. Gen. Stat. § 25-4-406(f), but the Court should allow La Casa and Slate to maintain claims for conversion (on a civil conspiracy theory), negligence and fraudulent concealment against Quincy.

**IT IS FURTHER RECOMMENDED** that Southern Community Bank and Trust's Motion for Summary Judgment (Docket Entry 72) be granted in part and denied in part in that the Court should:

(1)  enter judgment as a matter of law against Plaintiffs on their claims for RICO, fraud and breach of fiduciary duty by SCB, as well as all claims by Plaintiffs other than La Casa against SCB;

(2)  enter judgment as a matter of law against Plaintiffs as to any request for damages occurring from unauthorized payments made more than one year before SCB made available to La Casa statements indicating unauthorized account activity based on the application of N.C. Gen.

Stat. § 25-4-406 (except as to damages arising from any respondeat superior liability in connection with Plaintiffs' claims against Quincy for fraudulent concealment and/or conspiracy to commit conversion), for punitive damages against SCB, for damages occurring before SCB began doing business with La Casa; and for lost profit damages as to all Defendants; and

(3) allow La Casa to maintain claims against SCB for fraudulent concealment and conspiracy to commit conversion on a respondeat superior theory as well as for negligence on a respondeat superior theory and as to the handling the La Casa account.

**IT IS FURTHER RECOMMENDED** that Plaintiffs' Motion for Summary Judgment (Docket Entry 81) be granted in part and denied in part in that the Court should:

(1) decline to enter summary judgment in favor of Plaintiffs for their fraudulent transfer (or previously addressed RICO) claims against Rhonda, Charles and the corporate Defendant entities;

(2) enter judgment as a matter of law as to liability against Charles on Plaintiffs' claims for conversion, fraud, and fraudulent concealment in addition to liability as a co-conspirator on those same claims against Rhonda (except to the extent they relate to the Jewelry Conversion and the Payroll Conversion);

-73-

(3)  decline to enter judgment as a matter of law against Rhonda on Plaintiffs' claims of conversion, fraud, fraudulent concealment and breach of fiduciary duty so that those claims may proceed to trial for resolution of statute of limitations issues; and

(4)  enter judgment as a matter of law in favor of Plaintiffs on Rhonda and Charles's counterclaim for intentional infliction of emotional distress.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

March 15, 2013